FILED
United States Court of Appeals
Tenth Circuit

February 16, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JANET REINHARDT,

      Plaintiff - Appellant,

v.

ALBUQUERQUE PUBLIC SCHOOLS
BOARD OF EDUCATION; LINDA
DUNSTAN, in her official and
personal capacity; JANICE
QUINTANA, in her official and
personal capacity; ISABEL
TRUJILLO, in her official and
personal capacity,

      Defendants - Appellees.

No. 09-2005

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 07-CV-00563)**

---

Gail Stewart (and Laurel Nesbitt of Steven Granberg, Attorney at Law, on the
briefs), Albuquerque, New Mexico, for Plaintiff - Appellant.

Alex Walker of Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, New
Mexico, for Defendants - Appellees.

---

Before **TACHA**, **HOLLOWAY**, and **KELLY**, Circuit Judges.

---

**KELLY**, Circuit Judge.

Plaintiff-Appellant Janet Reinhardt appeals from the grant of summary judgment on both her Rehabilitation Act and First Amendment retaliation claims. On appeal, Ms. Reinhardt makes three major claims which, she argues, require reversal of the district court's orders. Ms. Reinhardt contends that: (1) the district court incorrectly ruled that her protected speech—filing a state level complaint—was made pursuant to her official job duties rather than as a private citizen; (2) the district court erred in finding that she had not shown a materially adverse employment action; and (3) the district court erred in concluding that Defendant met its burden in coming forth with a legitimate, nondiscriminatory reason for its action or that Ms. Reinhardt had not met her burden in establishing a genuine issue as to pretext. Our jurisdiction arises under 28 U.S.C. § 1291, and we reverse.

Background

Ms. Reinhardt has been employed as a speech-language pathologist (SLP) by Defendant-Appellee Albuquerque Public Schools Board of Education (APS) since 1996. Aplt. App. 85. During the time relevant to this action, she worked full-time at Rio Grande High School. Aplt. App. 85. SLPs with a full-time caseload receive a 1.0 contract ("standard contract"). APS grants a 0.2 contract increase if an SLP's caseload supports such an increase ("extended

contract").

Starting in 1998, Ms. Reinhardt regularly complained to APS administrators that she was not receiving accurate and timely caseload lists of students. Aplt. App. 153, 170 (Oct. 13, 2004 letter), 199-200. She believed the inaccurate lists were leading to qualified special education students not receiving speech and language services. Aplt. App. 199-200. Inaccurate lists also had the potential to affect SLPs' contract status and salaries. Aplt. App. 202-203. As she was unable to get APS to respond to her repeated complaints about the inaccurate caseload lists and corresponding deprivation of services to qualified students, Ms. Reinhardt consulted an attorney and filed an Individuals with Disabilities Education Act (IDEA) complaint with the New Mexico Public Education Department (NMPED) against APS on October 3, 2005 ("state complaint"). Aplt. App. 100-07, 204. The state conducted an investigation and ordered APS to take corrective action. Aplt. App. 106-07.

In addition to complaining about APS's failure to deliver services to special education students at Rio Grande High and filing the state complaint, Ms. Reinhardt also advocated for the rights of a particular high school student ("John Doe"). During the 2000-2001 school year, Ms. Reinhardt began advocating for him to receive a neuropsychological evaluation. Aplt. App. 199. He did not receive the evaluation until summer of 2003. Aplt. App. 18. After the evaluation, she advocated for him to receive specialized reading instruction

during the 2003-2004 school year. Aplt. App. 148, 199, 203.

Before the 2004-2005 school year, Ms. Reinhardt previously had received extended contracts. Aplt. App. 150. On August 17, 2004, Ms. Reinhardt was again granted an extended contract for the upcoming school year "based on the belief that she would be serving more than a full caseload." Aplt. App. 160, 304. On August 24, 2004, the assistant principal at Rio Grande High assigned Ms. Reinhardt to work with only 9th grade students for the 2004-2005 school year. Aplt. App. 163, 200. The remainder of the students were divided between the other two SLPs at Rio Grande High. Aplt. App. 163. Ms. Reinhardt's initial caseload list comprised only six students, well below a full-time caseload. Aplt. App. 170, 282. Ms. Reinhardt believed that 25 to 30 9th grade students should have been receiving services. Aplt. App. 201. On September 28, 2004, APS reduced her to a standard contract because her caseload did not support an extended contract. Aplt. App. 168, 305. Ms. Reinhardt requested a contract increase based on her caseload on January 18, 2006 and was denied. Aplt. App. 171.

In June 2007, Ms. Reinhardt brought suit against APS for, inter alia, First Amendment retaliation pursuant to 42 U.S.C. § 1983 and for retaliation in violation of § 504 of the Rehabilitation Act (§ 504), 29 U.S.C. § 794, based on her advocacy for the rights of disabled students. The district court granted APS's motion for summary judgment on Ms. Reinhardt's § 504 retaliation

-4-

claim. Aplt. App. 333-34. The court concluded that she had not met her burden in establishing a prima facie case of retaliation because she failed to show that APS subjected her to any materially adverse action. Aplt. App. 333. The court further found that even if Ms. Reinhardt had established a prima facie case, APS provided legitimate, non-discriminatory reasons for the actions at issue, and Ms. Reinhardt failed to demonstrate that APS's reasons were pretextual. Aplt. App. 333. The district court also granted APS summary judgment on Ms. Reinhardt's First Amendment retaliation claim. Aplt. App. 239. Applying Garcetti v. Ceballos, 547 U.S. 410, 421 (2005), the court held that Plaintiff's communications were made pursuant to her official duties and were therefore not protected by the First Amendment. Aplt. App. 238-39.

Discussion

We review the district court's grant of summary judgment de novo, applying the same standards as the district court. See Jarvis v. Potter, 500 F.3d 1113, 1120 (10th Cir. 2007). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "Unsupported conclusory allegations do not create a genuine issue of fact." L&M Enters., Inc. v. BEI Sensors & Sys. Co., 231 F.3d 1284, 1287 (10th Cir.

-5-

2000).  With respect to the § 504 claim, we review the establishment of a prima facie case of retaliation de novo.  In First Amendment cases, we have "an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression."  Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22, 473 F.3d 1271, 1276 (10th Cir. 2007) (internal quotation marks and citations omitted).

A.	Section 504 Retaliation Claim

The standard for retaliation claims under the Rehabilitation Act is the same as the standard for retaliation claims under the Americans with Disabilities Act (ADA).  Jarvis, 500 F.3d at 1125.  In the absence of direct evidence, Ms. Reinhardt may rely upon the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  She can establish a prima facie case by showing: (1) that she engaged in protected activity; (2) that she suffered a materially adverse action by APS either after or contemporaneous with her protected activity; and (3) a causal connection between the protected activity and the adverse action.  Proctor v. UPS, 502 F.3d 1200, 1208 (10th Cir. 2007) (applying Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006), in the context of ADA retaliation claims); Jarvis, 500 F.3d at 1125.  Thereafter, APS may produce evidence of a legitimate, nonretaliatory reason for the adverse action.  Jarvis, 500 F.3d at 1125 (internal

-6-

citation omitted).  If APS does so, the burden of production shifts back to Ms. Reinhardt to show that the proffered reason is pretextual.  Id.

1.    Protected Activity

At the summary judgment stage, Ms. Reinhardt presented three types of protected activity: (1) her advocacy for John Doe; (2) her longstanding complaints about APS's failure to deliver services to special education students at Rio Grande High by failing to provide SLPs with timely and accurate caseload lists; and (3) filing the state complaint.  Aplt. App. 187-88.  APS did not dispute that Ms. Reinhardt engaged in protected activity when she advocated for John Doe beginning in 2001, Aplt. App. 125, but APS argued that Plaintiff's internal complaints about inaccurate caseload lists and her state complaint relate to her First Amendment retaliation claim and not her § 504 claim.  Aplt. App. 207-08.  The district court recognized the factual dispute between the parties regarding the time frame of the protected activity, but it did not resolve the issue, nor did it address which activities were protected.  Aplt. App. 333.  APS does not further address the issue of Ms. Reinhardt's protected activities in its brief.

All three forms of Ms. Reinhardt's advocacy on behalf of disabled students constitute protected activity under the Rehabilitation Act.  Section 504 and the ADA prohibit discrimination against any individual "because such individual has opposed any act or practice made unlawful by this Act or

because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act." 42 U.S.C. § 12203(a) (incorporated by reference by 29 U.S.C. § 794(d)). The school is required to provide a "free appropriate public education" by providing education and related services that "are designed meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons." 34 C.F.R. § 104.33(a) & (b)(1) (2003); Sweet v. Tigard-Tualatin Sch. Dist., 124 F. App'x 482, 485 n.1 (9th Cir. 2005) (holding that a public school psychologist's complaints regarding potential IDEA violations were protected from retaliation under § 504); see also Barker v. Riverside County Office of Educ., 584 F.3d 821, 824-26 (9th Cir. 2009) (holding that a teacher has standing to sue the County Office of Education for retaliation under § 504 where she alleged that she was constructively discharged after advocating for the rights of disabled students). The Third Circuit has noted that protected activity must go beyond merely assisting special education students but that "affirmative action in advocating for, or protesting discrimination related to, unlawful conduct by others" falls within protected activity. Montanye v. Wissahickon Sch. Dist., 218 F. App'x 126, 131 (3rd Cir. 2007). We agree with the Ninth and Third Circuits that attempting to protect the rights of special education students constitutes protected activity under the Rehabilitation Act. It is apparent from the undisputed facts that Ms. Reinhardt engaged in protected

-8-

activity for the purposes of § 504 through at least October 3, 2005 when she filed the state complaint.

2.    Materially Adverse Action

On appeal, Ms. Reinhardt limits her argument to four actions that were briefed below to establish a materially adverse action: (1) the reduction of her salary in September 2004 when APS reduced her extended contract to a standard contract; (2) APS's refusal to increase her standard contract to an extended contract despite her requests through March 16, 2006; (3) APS assigning her only 9th grade students beginning in the 2004-2005 school year; and (4) APS telling NMPED in 2005 that a police report had been filed against her in 2004. Aplt. Br. 29-30; Aplee. Br. 23.

Ms. Reinhardt argues that any loss of salary is a materially adverse job action. Aplt. Br. 30. APS counters that Ms. Reinhardt has never explained why being assigned to serve all of the 9th grade students was materially adverse. Aplee. Br. 26. It notes that Ms. Reinhardt's reduction to a standard contract was not materially adverse because she was still employed under a full-time contract with the same benefits and was not entitled to an extended contract. Aplee. Br. 31. Ms. Reinhardt argues that being assigned to serve only 9th grade students, which reduced her workload, and the resulting reduction of her extended contract to a standard contract cost her the salary that she was accustomed to receiving under her usual extended contract. Aplt. App.

182. She also alleges that APS deliberately maintained inaccurate caseload lists that artificially reduced her workload to reduce her salary and refused to extended her contract once her caseload increased. Aplt. App. 182-85.

The Supreme Court has held that an "adverse action" for purposes of a retaliation under Title VII of the Civil Rights Act of 1964, "is not limited to discriminatory actions that affect the terms and conditions of employment." Burlington Northern, 548 U.S. at 64. To establish an adverse action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68 (internal quotation marks and citation omitted). We have applied this same standard to retaliation claims under the ADA, and ADA standards apply to § 504 claims. See, e.g., Jones v. U.P.S., Inc., 502 F.3d 1176, 1193 (10th Cir. 2007) (ADA claims); Jarvis, 500 F.3d at 1125 (Section 504 claims). We construe the phrase "adverse employment action" liberally and do not limit it to "monetary losses in the form of wages or benefits." Annett v. Univ. of Kan., 371 F.3d 1233, 1239 (10th Cir. 2004) (quotation marks and citation omitted). Acts that carry "a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects" may be considered adverse actions, although "'a mere inconvenience or an alteration of job responsibilities' will not suffice." Id. (citation omitted).

-10-

Contrary to APS's assertion, being assigned to serve only 9th grade students was not merely "an alteration in job responsibilities." Aplee. Br. 31. The changed assignment directly led to a reduction in compensation because Ms. Reinhardt no longer qualified for an extended contract. When her caseload increased, APS did not grant her an extended contract, and this also affected her salary. In fact, because Ms. Reinhardt's original 2004-2005 caseload list only included six students, Rio Grande High's assistant principal acknowledged that it "would . . . be reasonable that [Ms. Reinhardt] would be fearful for her job." Aplt. App. 295. This is not to say that a denial of overtime opportunity is always a materially adverse action,[1] but under these facts, we think a reasonable employee might have been dissuaded from advocating for special education students knowing that her workload and salary would be reduced. Cf. Bergeron v. Cabral, 560 F.3d 1, 9-10 (1st Cir. 2009) (denial of overtime opportunities may constitute an adverse employment action).

As for Ms. Reinhardt's allegation that APS falsely told NMPED in 2005 that a police report had been filed against Plaintiff in 2004, such an action could be materially adverse because it could damage her reputation and harm future employment prospects. See Annett, 371 F.3d at 1239; Berry v. Stevinson Chevrolet, 74 F.3d 980, 986-87 (10th Cir. 1996) (false report).

---

[1] We in no way imply that an employer is required to provide overtime opportunities lacking any work or business justification.

However, the record does not support that APS told NMPED that it had filed a police report against Plaintiff. Ms. Reinhardt states that she has "never seen the police report which was allegedly made against me in 2004; it was mentioned in two or three statements that were sent to the New Mexico Public Education Department in response to the state complaint I filed in the fall of 2005." Aplt. App. 201. Neither APS's NMPED responses that allegedly mention the police report nor the actual police report appear in the record. See Fed. R. Civ. P. 56(e).

3.     Causal Connection

We are persuaded that Ms. Reinhardt has shown sufficient facts to establish a causal connection between her advocacy for disabled students and the adverse employment actions taken against her. Causal connection may be established by producing "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1228 (10th Cir. 2006) (quotation marks and citation omitted). Ms. Reinhardt continuously complained about inaccurate caseload lists, and it is undisputed that she advocated for John Doe through the 2003-2004 school year. She was assigned to teach only 9th grade students on August 24, 2004, and on September 28, 2004, APS reduced her to a standard contract. Given the normal summer break in the school year (May-August), the adverse actions closely followed Ms.

-12-

Reinhardt's protected activity as they occurred at the beginning of the next school term. And while the denial of her January 18, 2006 request for an extended contract based on her increased caseload occurred well after her advocacy for John Doe, APS's refusal may be part of the original pay reduction action and occurred shortly after Ms. Reinhardt filed the state complaint in October 2005.

4.      APS's Legitimate, Nondiscriminatory Reason for the Adverse Employment Action and Ms. Reinhardt's Showing of Pretext

To establish a genuine issue of material fact as to pretext, Ms. Reinhardt must demonstrate that APS's "proffered non-discriminatory reason is unworthy of belief." Pinkerton v. Colo. Dept. of Transp., 563 F.3d 1052, 1065 (10th Cir. 2009) (internal quotation marks and citations omitted). Ms. Reinhardt can meet this standard by producing evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Id. (internal quotation marks and citations omitted). If a plaintiff advances evidence upon which a factfinder could conclude that the defendant's allegedly nondiscriminatory reasons for the employment decisions are pretextual, the court should deny summary judgment.

APS states that it assigned Ms. Reinhardt only 9th grade students for the

2004-2005 school year because she had experience transitioning middle school students to high school through her work during the previous school year. Aplee. Br. 28; Aplt. App. 163. Ms. Reinhardt notes that at least one of the other two SLPs at Rio Grande High had also previously worked with 9th grade students. Aplt. App. 153. There is also no explanation in the record why Ms. Reinhardt could not be assigned other students in addition to the 9th graders. Being assigned to serve only 9th grade students resulted in such a low original caseload that it "would . . . be reasonable that [Ms. Reinhardt] would be fearful for her job." Aplt. App. 295.

As for reducing Ms. Reinhardt's pay in September 2004, and refusing to extend her contract in January 2006, APS argues that it was unnecessary to give her an extended contract because her schedule did not warrant one. Aplt. App. 160, 165. However, Ms. Reinhardt argues that APS deliberately maintained inaccurate caseload lists that artificially reduced her workload to reduce her salary. Aplt. App. 182-85. The state investigation concluded that APS was maintaining inaccurate lists, which resulted in qualified special education students not obtaining services. Aplt. App. 204. Furthermore, there is a factual dispute as to how APS actually calculates "extended contracts" and whether Ms. Reinhardt qualified for such a contract during 2004-2006. Aplt. App. 285. APS has stated that an SLP must have 48 students to qualify for an extended contract. Aplt. App. 325. At other times APS has said 35 to 40 students is a

full-time caseload. Aplt. App. 315. Yet at other times, APS maintains that number of students is just one factor in determining caseload because some students require more intensive services. Aplt. App. 312. While APS has provided data about the hourly pay rate for SLPs, Aplt. App. 285, it has provided no information about how SLP caseloads or salaries are determined at Rio Grande High. Without expressing any opinion on the merits, we think Ms. Reinhardt has offered sufficient evidence of pretext to withstand summary judgment on her § 504 retaliation claim.

B.     First Amendment Retaliation Claim

In determining whether APS impermissibly retaliated against Ms. Reinhardt in violation of her First Amendment rights, we apply the test from Pickering v. Board of Education, 391 U.S. 563, 568 (1968), and Connick v. Myers, 461 U.S. 138, 147 (1983). Deschenie, 473 F.3d at 1276. Our inquiry in this case is limited to whether Ms. Reinhardt spoke as a citizen or as a public employee. We express no opinion on whether Ms. Reinhardt can meet the other elements of a claim for protected speech, including whether the speech was on a matter of public concern.

Garcetti v. Ceballos sets the boundaries of "protected" employee speech, and the parties agree that this is the controlling law. Aplt. App. 237. Garcetti recognized that employee speech made pursuant to the employee's professional

duties is not afforded First Amendment protection. 547 U.S. at 421. We have

noted that "[t]he question under Garcetti is not whether the speech was made

during the employee's work hours, or whether it concerned the subject matter

of his employment." Thomas v. City of Blanchard, 548 F.3d 1317, 1323 (10th

Cir. 2008). The key is "whether the speech was made pursuant to the

employee's job duties or, in other words, whether the speech was

commissioned by the employer." Id. (internal quotation marks and citation

omitted). Rather than defining a comprehensive framework for defining the

scope of an employee's duties, the Supreme Court emphasized that the inquiry

is "a practical one," noting that "formal job descriptions often bear little

resemblance to the duties an employee actually is expected to perform."

Garcetti, 547 U.S. at 424-25. Post Garcetti, this court has generally identified

two factors that suggest an employee was speaking as a private citizen rather

than pursuant to her job responsibilities: (1) the employee's job responsibilities

did not relate to reporting wrongdoing and (2) the employee went outside the

chain of command when reporting the wrongdoing. See Thomas, 548 F.3d at

1324-25; Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1204-

05 (10th Cir. 2007); Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323,

1330-33 (10th Cir. 2007).[2] Ms. Reinhardt's speech—filing the state

_____

[2] For a review of circuit cases post-Garcetti, see Robert J. Tepper & Craig
G. White, Speak No Evil: Academic Freedom and the Application of Garcetti v.

-16-

complaint—satisfies both of these factors.

In Brammer-Hoelter, we indicated that "speech may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform." 492 F.3d at 1203. Thus the fact that it was not expressly Ms. Reinhardt's duty to report IDEA violations to NMPED is not dispositive on whether she was acting "pursuant" to her duties. While we have held that if speech "reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties," id., "it would be going too far to hold that every time a public employee discovers alleged wrongdoing related to his job and brings it to the attention of law enforcement or other outside parties, the speech is unprotected," Thomas, 548 F.3d at 1324. After all, "[e]mployees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government." Garcetti, 547 U.S. at 423.

Ms. Reinhardt was not hired to ensure IDEA compliance at Albuquerque public schools. She was hired to provide speech and language services to special education students. Ms. Reinhardt's consulting an attorney and filing

Ceballos to Public University Faculty, 59 Cath. U.L. Rev. 125, 168 & n.284-85 (2009).

-17-

the state complaint went well beyond her official responsibilities. APS argues that "involving an attorney in the process does not somehow transform otherwise unprotected speech into protected speech." Aplee. Br. 16. While APS is correct that attorney involvement is not dispositive, involving counsel under these facts suggests that Ms. Reinhardt was acting beyond her job duties.

We discussed the line between "official" and "unofficial" duties in Casey, 473 F.3d at 1323. Ms. Casey, the Chief Executive Officer of a Head Start program in New Mexico, discovered that the school board had been violating the Open Meetings Act. Id. at 1326. After her warnings were ignored by the Board, she filed a complaint with the New Mexico Attorney General's office. Id. We held that Ms. Casey was not acting within her job duties when she reported the Board's alleged violation of the Act to the New Mexico Attorney General. Id. at 1332. We distinguished the complaint to the attorney general from an incident where Ms. Casey ordered a subordinate to report the Board's noncompliance to federal Head Start officials. Id. at 1329. Because the Board had committed the Head Start program to Ms. Casey's care, and she had independent responsibilities to the federal government to report fraud, we held that reporting the noncompliance to federal authorities was part of her job duties. Id. at 1329-32.

We think Ms. Reinhardt's decision to file the state complaint is akin to

the claims we allowed to proceed in <u>Casey</u> and <u>Thomas</u>. Ms. Reinhardt's repeated attempts to use internal mechanisms to remedy the problem of inaccurate caseload lists proved futile, and she took her concerns beyond that realm. Likewise, when both Mr. Thomas and Ms. Casey went beyond their supervisors and reported to someone outside the chain of command about matters that were not committed to their care, we found that such speech was protected by the First Amendment. <u>Thomas</u>, 548 F.3d at 1324-25; <u>Casey</u>, 473 F.3d at 1332-33. Thus, when Ms. Reinhardt went beyond complaining to administrators at Rio Grande High and filed the IDEA state complaint with NMPED—an agency outside her direct chain of command—her speech was not pursuant to official duties, but rather was the speech of a private citizen. <u>Thomas</u>, 548 F.3d at 1325.

Following <u>Casey</u> and <u>Thomas</u>, we must also consider whether Ms. Reinhardt had an underlying legal obligation to report APS's IDEA violations. In <u>Casey</u>, the plaintiff had an obligation under federal statute to report fraud. 473 F.3d at 1330. We distinguished Ms. Casey's statutorily required duties from Mr. Thomas's case. Mr. Thomas believed he had an obligation to report wrongdoing, and the district court relied on this ground in granting summary judgment for the defendants. <u>Thomas</u>, 548 F.3d at 1325. Reversing, we noted Mr. Thomas was employed by the city, not by the state—the entity to which he reported the wrongdoing. Also, unlike Ms. Casey, "[h]e was not given

-19-

'primary responsibility' for [reporting]. More importantly, perhaps, it cannot be the case that a criminal liability statute aimed at every public official should somehow become part of every public official's job description." Id. at 1326. We concluded that such a reading "would effectively make the obligation to report *and seek the prosecution of* fraud part of every employee's job." Id. Similarly, Ms. Reinhardt felt that she had a duty to report the denial of services to special education students as part of her professional obligations, and the district court found this to be conclusive that Ms. Reinhardt was speaking as an employee and not as a private citizen. Aplt. App. 238. APS argues that Ms. Reinhardt had a duty imposed by New Mexico statute that all licensed school employees "enforce all laws and rules applicable to his public school and school district" and "furnish reports as required." N.M. Stat. § 22-10A-3; Aplee. Br. 13. APS also points to NMPED's Code of Ethical Responsibility as a source of legal obligation. Aplee. Br. 13; N.M.A.C. §6.60.9.8(B)(4). Ms. Reinhardt repeatedly complained to administrators at Rio Grande High about the inaccurate caseload lists. She also used the internal grievance procedures. Aplt. App. 204. These acts probably fulfilled her obligations under the state statute. To go beyond this, and to consult an attorney to prepare and file an IDEA complaint with NMPED, was beyond her professional responsibilities as an SLP.

Exercising de novo review of the legal question of whether Ms.

-20-

Reinhardt's speech was made pursuant to her official duties, we conclude that it was not. Because APS's motion for summary judgment and the district court's order was limited to this question, Aplt. App. 76-77, 237-39, we do not consider whether her speech was on a matter of public concern, whether it was a motivating factor in the adverse actions taken against her, and whether APS's interest in regulating her speech was greater than Ms. Reinhardt's interest in making it. See, e.g., Deschenie, 473 F.3d at 1276; see also Davis v. McKinney, 518 F.3d 304, 316-17 (5th Cir. 2008) (remanding for a determination of whether statements made as a citizen raise matters of public concern).

REVERSED.