**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 21, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

LINDA VAN DYKE, as personal
representative of the Estate of Jack
Van Dyke,

     Plaintiff - Appellant,

v.

UNITED STATES OF AMERICA,

     Defendant - Appellee,

GLAXOSMITHKLINE,

     Defendant.

No. 09-8061
(D.C. No. 05-CV-00153-ABJ)
(D. Wyo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **HOLLOWAY**, and **LUCERO**, Circuit Judges.

---

Plaintiff-Appellant Linda Van Dyke, representative of the Estate of Jack

Van Dyke, appeals from the grant of summary judgment in favor of the United

States on her Federal Tort Claims Act ("FTCA") claims, 28 U.S.C. §§ 1346(b),

2671-80.  Ms. Van Dyke argues that the district court erred in concluding that her

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

husband's suicide was an intervening cause that precludes government liability for negligence by Veteran Affairs Medical Center ("VA") employees. She further argues that the pharmacist who filled Mr. Van Dyke's prescription and the nurse who advised Ms. Van Dyke about the side effects of the drug had a duty to know and convey current risk information to patients. The United States ("the Government") counters that (1) Wyoming's Medical Review Panel Act precludes Ms. Van Dyke's claims, (2) Mr. Van Dyke's suicide and not the Government's negligence was the legal cause of his death, and (3) VA employees did not have a legal duty to warn patients of the risk of suicidal behavior associated with prescription medicines. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm in part and reverse in part.

Background

On June 29, 2004, Jack Van Dyke sought treatment for anxiety from the VA in Sheridan, Wyoming. 2 Aplt. App. 406-07. Dr. William Williams prescribed a beta-blocker and scheduled a follow-up visit. 2 Aplt. App. 406-07. At the July 6, 2004 follow-up visit, Dr. Williams additionally prescribed the antidepressant Paxil and advised Mr. Van Dyke to return in two to three weeks. 2 Aplt. App. 406. Dr. Williams also "put in a consult for psychiatry . . . to see if they can better pick medications." 2 Aplt. App. 406.

At the time Dr. Williams prescribed Paxil to Mr. Van Dyke, the FDA had

issued a Public Health Advisory about Paxil and other antidepressants. 2 Aplt. App. 506-07. This March 22, 2004 Advisory stated, "Health care providers should carefully evaluate patients in whom depression persistently worsens, or emergent suicidality is severe, abrupt in onset, or was not part of the presenting symptoms." 2 Aplt. App. 506. The Advisory further suggested, "Health care providers should instruct patients, their families and their caregivers to be alert for the emergence of agitation, irritability, and the other symptoms described above, as well as the emergence of suicidality and worsening depression, and to report such symptoms immediately to their health care provider." 2 Aplt. App. 507. In April 2004, Paxil's manufacturer amended the drug's labeling to reflect the Advisory. 3 Aplt. App. 607, 631. In May 2004, the manufacturer issued a "Dear Healthcare Professional" letter, advising of the March Advisory and the new warnings. 2 Aplt. App. 509-11.

A VA pharmacist filled Mr. Van Dyke's Paxil prescription on July 6, 2004 with the correct dosage and in accordance with Dr. Williams's order. 1 Aplt. App. 89, 281. The VA pharmacy's practice was to generate a patient medication information sheet for each prescription. 1 Aplt. App. 282. Ms. Van Dyke claims neither she nor her husband received such an information sheet. 1 Aplt. App. 165. Regardless, the information sheet that would have been generated on that date would not have included the recent warnings about an increased risk of suicide or any warnings to watch out for signs of suicidal thoughts or behaviors. 1 Aplt.

App. 278-79.

Two days later, Ms. Van Dyke called the VA to discuss her husband's symptoms with his primary care physician, Dr. Rita Cherni-Smith. 2 Aplt. App. 405. The VA's policy was to have nurses, rather than doctors, field such calls. 2 Aplt. App. 515. If the patient's concerns were something that the nurse could address, the nurse typically would not consult a doctor, but would handle it herself. 2 Aplt. App. 515. Consistent with this practice, Nurse Franci Felde returned Ms. Van Dyke's telephone call. Nurse Felde consulted Mosby's 2004 Nursing Drug Reference during their conversation. 2 Aplt. App. 405, 516. This edition of Moby's had not been updated with suicidality warnings for Paxil, and Nurse Felde was unaware of the FDA advisory and the "Dear Healthcare Professional" letter. 2 Aplt. App. 519; 3 Aplt. App. 637-47.

Ms. Van Dyke told Nurse Felde that her husband's depression had not improved after starting the Paxil. 2 Aplt. App. 405. Nurse Felde explained that "it would take some time for [the] medication to start being effective." 2 Aplt. App. 405. Using the Mosby's drug manual as a reference, Nurse Felde discussed side effects of the medication. Although she does not remember the details of their conversation, she testified that Paxil's mental and mood side effects were the kind of information she always discussed. 2 Aplt. App. 405, 515-16. She also told Ms. Van Dyke to give the medication seven to ten days to take effect, but "to call back with any changes she notices that concern her." 2 Aplt. App. 405, 516.

- 4 -

Ms. Van Dyke testified that Nurse Felde did not tell her about the FDA Advisory or about any increased risk of suicidal thoughts or behaviors associated with Paxil. 3 Aplt. App. 596. Nor did Nurse Felde tell her that she should "closely watch Jack for signs of emerging suicidality;" or that she should take him to the hospital "if [she] saw any particular signs." 3 Aplt. App. 596. Ms. Van Dyke did not call the VA hospital again, although she did call Dr. Williams's private medical office about a week later to report that Mr. Van Dyke was having problems with the medication. 2 Aplt. App. 314-18. On July 23, 2004, seventeen days after he began to take Paxil, Mr. Van Dyke committed suicide. 2 Aplt. App. 379-80.

Ms. Van Dyke filed a wrongful death and products liability action against the drug manufacturer on May 31, 2005. Aplee. Supp. App. 1-17. She thereafter filed an administrative tort claim based on "the failure of the [VA], or any of its medical professionals, to provide adequate warnings about the known risks of emergent suicidal behavior, or its precursor symptoms," associated with antidepressants such as Paxil. 1 Aplt. App. 150-57; see 28 U.S.C. § 2675(a). This administrative claim was denied. 1 Aplt. App. 221-22. Ms. Van Dyke amended her original complaint on January 26, 2007 to add the United States as a defendant and to assert a claim under the FTCA. 1 Aplt. App. 36-55. Ms. Van Dyke's FTCA claim alleged, inter alia, that the pharmacist who filled the prescription and Nurse Felde—based on her actions in fielding Ms. Van Dyke's call to the VA about the medication—were negligent for failing to warn her or her husband that

Paxil was associated with a risk of suicidal behavior. 1 Aplt. App. 37, 45-46. In other words, Ms. Van Dyke contended that because the VA pharmacist and Nurse Felde knew, or should have known, that Paxil posed a risk of suicidal behavior, they both had a duty to disclose that risk. 1 Aplt. App. 45-46.

The Government moved to dismiss the FTCA claim for failure to comply with the Wyoming Medical Review Panel Act's pre-filing requirements for malpractice claims. Aplee. Supp. App. 19. The district court denied the motion. Aplee. Supp. App. 18-32. The Government then moved for summary judgment. 1 Aplt. App. 77-78, 81-140. In granting summary judgment, the district court held Mr. Van Dyke's suicide was an intervening cause that precludes liability for negligence under Wyoming law. 3 Aplt. App. 794-812. The court also noted that neither the VA pharmacist nor Nurse Felde had a duty to communicate current warnings about Paxil to the Van Dykes. 3 Aplt. App. 812-13, 816-17, 820.


## Discussion

We review the district court's grant of summary judgment de novo, applying the same standards as the district court. See, e.g., Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d 1126, 1131 (10th Cir. 2010). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

- 6 -

We view the facts from the district court record in the light most favorable to Ms. Van Dyke, the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007). Where the moving party seeks summary judgment on its own affirmative defense, it bears the burden of pleading and proving the affirmative defense. Pelt v. Utah, 539 F.3d 1271, 1283-84 (10th Cir. 2008).

Under the FTCA, courts look to state law to resolve questions of substantive liability. See Miller v. United States, 463 F.3d 1122, 1123 (10th Cir. 2006). The United States's liability under the FTCA is limited to that of "a private individual under like circumstances." Id. (internal citations and quotation marks omitted). We review the district court's interpretation and determination of state law de novo. See Rash v. J.V. Intermediate, Ltd., 498 F.3d 1201, 1206 (10th Cir. 2007). "Where the state's highest court has not addressed the issue presented, the federal court must determine what decision the state court would make if faced with the same facts and issue." Id. (internal citation and quotation marks omitted).

A.    Wyoming Medical Review Panel Act

The Wyoming Medical Review Panel Act of 2005, which took effect after Ms. Van Dyke filed her initial complaint but before she amended her complaint to add the United States as a party, generally requires a medical malpractice claim to be submitted to a state medical review panel before filing suit against a health care provider. Wyo. Stat. Ann. §§ 9-2-1513 to -1523 (2005). The Act exempts suits filed before July 1, 2005. Wyo. Stat. Ann. §§ 9-2-1518. The district court

determined that the Act was not applicable because Ms. Van Dyke's claims against the United States related back under Federal Rule of Civil Procedure 15(c) to the date of her original complaint. Aplee. Supp. App. 30-31. In addition, the court noted that "grant[ing] the defendant United States' motion to dismiss for failure to comply with the provisions of the Wyoming Medical Review Panel Act at this late date is not fair nor is it equitable." Aplee. Supp. App. 31-32.

Tenth Circuit Rule 10.3(D)(2) requires the parties to include motions, responses, and replies in the record. While the record includes the district court's order denying the Government's motion to dismiss for failure to comply with the Act, it does not contain the motion itself nor Ms. Van Dyke's response. As we have previously cautioned, "[a]lthough the omitted documents are available electronically, such availability does not negate the [government's] responsibility to provide an adequate record. Nor does it require this court to actually view those documents and, in effect, supplement the record." Heil v. Wells Fargo Bank, N.A., 298 F. App'x 703, 705 n.2 (10th Cir. 2008) (citations omitted). Ms. Van Dyke argues that we should not consider this argument given the insufficient record. Aplt. Reply Br. 10. We agree. See Heil, 298 F. App'x at 705; 10th Cir. R. 10.3(B).

B.    Suicide as an Intervening Cause that Precludes Liability

Citing R.D. v. W.H., 875 P.2d 26 (Wyo. 1994), and Cook v. Shoshone First Bank, 126 P.3d 886 (Wyo. 2006), the district court concluded that Mr. Van Dyke's

suicide was an intervening cause that precluded liability under the FTCA. 3 Aplt. App. 794-812. These cases neither compel nor support such a conclusion.

In R.D. v. W.H., the plaintiff claimed his deceased wife's stepfather's negligent act caused his wife's wrongful death. 875 P.2d at 28. The decedent had previously attempted to commit suicide using a gun that her stepfather gave her for protection. Id. Five days after this failed attempt, the stepfather obtained Elavil (an antidepressant) for decedent at her request despite knowing that she previously had attempted to commit suicide by taking an overdose of this drug. Id. Two days thereafter, the decedent committed suicide by ingesting an overdose of Elavil. Id. The trial court granted the stepfather's motion to dismiss on the grounds that decedent's suicide was an intervening cause that prevented recovery. Id. The Wyoming Supreme Court reversed. Id. at 31. The supreme court began its analysis by noting, "The general rule with regard to liability for negligent actions which lead to suicide is: The decedent's intentional and voluntary act in taking his own life is an intervening cause which breaks the chain of causation and precludes a finding of liability against the tortfeasor." Id. at 28. The court then adopted an exception codified in Restatement (Second) of Torts § 455 which provides: "If the actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to himself while delirious or insane . . . ." Id. at 29. The court held that the plaintiff's complaint sufficiently articulated a claim of wrongful death on the basis

of the stepfather's actions which allegedly caused insanity—the suicide demonstrated the victim's inability to realize the nature of her act or risk of harm involved, or involved an irresistible impulse caused by insanity. In adopting this exception, the court remarked that courts have recognized other exceptions to the rule that suicide precludes liability. Id. at 28-29 & n.1 ("[W]e do not consider what other exception may apply in Wyoming to the general rule.").

In Cook, the plaintiff's wife worked as a teller at a bank. 126 P.3d at 887. The bank believed some money was missing and questioned her, ultimately placing her on administrative leave pending an investigation. Id. She committed suicide a few hours later. Id. at 888. Citing the § 455 exception, the plaintiff argued that the bank negligently caused his wife's suicide by falsely accusing her of theft, which caused her to become insane. Id. at 896. The supreme court held that the § 455 exception did not apply because the plaintiff had not established that the bank committed a wrongful act. Id. at 896-97.

We question the applicability of § 455 to a negligent failure to warn of suicide where the plaintiff alleges a duty and an inadequate or non-existent warning that causes the decedent's suicide and resulting damages. It is certainly not an obvious defense given the many, many reported cases involving failure to warn of the risk of suicide. Far from being an independent intervening cause, the suicide is an integral part of the tort. The Government argues that injury or death is a part of any negligence claim, apart from proximate cause; but here, the suicide

is the manifestation of the undisclosed risk, an essential part of the tort of failing to disclose that risk. Aplee. Br. 21. As for the Government's argument that Ms. Van Dyke did not make this argument below, the record is otherwise: "It is certainly foreseeable that, if a person is given prescription medication which can cause 'a small vulnerable sub-population' of individuals to commit suicide, and if he is not warned about that risk, then he will do so. That, in essence, is what this case is all about." 2 Aplt. App. 485.

We also must reject the Government's argument that there is only one exception to the general rule that suicide is an independent intervening cause. Aplee. Br. 17. R.D. v. W.H. makes it clear that the Wyoming Supreme Court recognizes that other exceptions may exist. 875 P.2d at 29 n.1 (a jail or hospital may have special duty to prevent residents from committing suicide); see also Stroup v. Oedekoven, 995 P.2d 125, 130 (Wyo. 1999) (assuming without deciding that a jail had such a duty). Assuming that § 455 should apply, the tort of negligent failure to warn of the risk of suicide implies that the suicide was not voluntary and could fit within the exception. See 2 Aplt. App. 483 (indicating that the parties agree that Mr. Van Dyke was not suicidal before taking Paxil). We do not read into the exception a requirement of "affirmative misconduct" as does the Government. Aplee. Br. 18-19. Section 455 speaks of the "actor's negligent conduct," and though intentional conduct (such as intentional infliction of emotional distress) may trigger § 455, it is not required. See e.g., Rimbert v. Eli

Lilly & Co., 577 F. Supp. 2d 1174, 1232-35 (D.N.M. 2008). As in Rimbert, the negligent conduct here is the failure to warn. The district court incorrectly concluded that, as a matter of law, Mr. Van Dyke's suicide was an intervening cause precluding liability.

C.     The VA Pharmacist's Duty

As an alternative ground for dismissal, the district court held that the VA pharmacist did not have a duty to warn the Van Dykes about the suicide-related side effects of Paxil. 3 Aplt. App. 812-13, 819-20. It concluded that the pharmacist merely had a duty to properly fill the prescription as written by Dr. Williams. 3 Aplt. App. 812-13. Ms. Van Dyke does not allege the pharmacist breached this duty.

Ms. Van Dyke contends that Wyo. Stat. Ann. § 33-24-136(c) imposes a duty on pharmacists to disclose potential risks of prescription drugs that they dispense. Aplt. Br. 24. However, that statute only requires pharmacists to "counsel patients if requested, concerning and in conjunction with drugs dispensed pursuant to a new prescription." Wyo. Stat. Ann. § 33-24-136(c) (emphasis added). The statute does not require pharmacists to supply current risk information. Regardless, the record does not support that the Van Dykes sought any counseling from the VA pharmacist.

Our research has not uncovered any Wyoming cases addressing whether a pharmacist has a duty to provide current risk information to patients. As a result,

we must predict how the Wyoming Supreme Court would rule. See, e.g., Boehme v. U. S. Postal Serv., 343 F.3d 1260, 1264 (10th Cir. 2003). To this end, "we are free to consider all resources available, including decisions of [Wyoming] courts, other state courts and federal courts, in addition to the general weight and trend of authority." Id. (internal quotation marks and citation omitted). A majority of state courts have held that pharmacists do not have a duty to warn patients. See, e.g., Abram S. Barth, Is Three a Crowd or Company?: Behind the Counter Drugs, 63 Food & Drug L.J. 865, 877 n.94 (2008) (collecting cases discussing the absence of a duty to warn). "Beyond dispensing the correct medication, compounding the appropriate dose, labeling the bottle correctly, and identifying harmful drug interactions," pharmacists generally have no additional duty to warn customers of a prescription drug's side effects. Id. at 877. This type of counseling is assumed to have been performed by the physician. Id. Given this weight and trend of authority, we agree that there is no reason to expect that Wyoming would depart from the majority rule.

D.     Nurse Felde's Duty

The district court also held that Nurse Felde did not have a duty to warn the Van Dykes about the suicide-related side effects of Paxil. 3 Aplt. App. 816-17, 819-20. Nurse Felde owed a duty of reasonable care to Mr. Van Dyke, and determining the standard of care or duty is a matter of law. Beavis v. Campbell County Mem'l Hosp., 20 P.3d 508, 512-13 (Wyo. 2001). The Government argues

that it is the physician's role to counsel the patient about the drugs he is prescribing, and as a result, nurses do not have any duty to convey risk information to patients. Aplee. Br. 26-27. Although the Wyoming Supreme Court has yet to address whether nurses have a general duty to convey risk information, even were the supreme court to adopt the Government's reasoning and rule, the particular facts at hand remove this case from the general situation.

Here, the VA tasked nurses with fielding patient calls. 2 Aplt. App. 515. The nurses acted as intermediaries, and patients could not directly communicate with a doctor. 2 Aplt. App. 516. Deposition testimony indicates that if the patient's concerns were something that the nurse felt she could handle, she would do so without consulting a doctor. 2 Aplt. App. 515. According to Nurse Felde, she counseled Ms. Van Dyke about Paxil's mental and mood side effects because she "want[ed] them to have all the information possible to them. . . . [I]t would have been me that interjected watch for these things." 2 Aplt. App. 515. Thus, Nurse Felde, in her discretion, determined that Ms. Van Dyke's call was one she felt competent to handle without consulting a doctor. While she was counseling Ms. Van Dyke, Nurse Felde made another determination—that she was competent to discuss Paxil's side effects. Because the VA's gatekeeping policy resulted in patients receiving counseling from a doctor or a nurse but not both, there was little risk that patients would receive conflicting advice. Under these circumstances, we are hard pressed to hold that the nurse does not owe a duty of reasonable care to

the patient she is counseling.  In reaching this conclusion, we express no opinion on whether Ms. Van Dyke can meet the other elements of her negligence claim, including whether Nurse Felde's counseling breached the appropriate standard of care.  Beavis, 20 P.3d at 512.

Accordingly, we AFFIRM the district court's grant of summary judgment to the Government on Ms. Van Dyke's FTCA claim based on the VA pharmacist's failure to provide current risk information.  We REVERSE on Ms. Van Dyke's FTCA claim based on Nurse Felde's failure to provide current risk information and REMAND for further proceedings consistent with this opinion.

Entered for the Court

Paul J. Kelly, Jr.
Circuit Judge