FILED
United States Court of Appeals
Tenth Circuit

December 3, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

IRA THOMAS,

        Plaintiff-Appellant,

v.

CITY OF BLANCHARD, BILL
EDWARDS, MONTE KETCHUM and
TOM SACCHIERI,

        Defendants-Appellees.

No. 07-6197

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CIV-06-489-D)**

---

Mark Hammons, Hammons & Associates (Tamara L. Gowens, with him on the brief), Oklahoma City, Oklahoma, for the Plaintiff-Appellant.

David W. Lee, Lee & Gooch, P.C. (Ambre C. Gooch, with him on the brief), Oklahoma City, Oklahoma, for the Defendant-Appellees City of Blanchard, Bill Edwards and Monte Ketchum.

David W. Kirk, Lytle, Soulé & Curlee, P.C. (Robert Ray Jones, Jr., with him on the brief) for Defendant-Appellee Tom Sacchieri.

---

Before **MURPHY**, **McKAY** and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

Plaintiff-Appellant Ira Thomas was fired from his job as building code inspector for the City of Blanchard, Oklahoma, after he discovered in the City Clerk's office a signed and completed certificate of occupancy for a home constructed by a local builder — who is also the mayor — although Mr. Thomas had not yet made the final inspection of the home or approved issuance of the certificate. Suspecting illegality, Mr. Thomas responded forcefully (and maybe even inappropriately; that is a disputed issue) by storming into a meeting to denounce the certificate, shouting at the City Clerk, threatening to report the matter to the Oklahoma State Bureau of Investigation ("OSBI"), and eventually following through on the threat. Mr. Thomas sued the City and various individual defendants, including the mayor, claiming his discharge was in retaliation for his speech — primarily, his reporting the matter to the OSBI — and therefore in violation of the Free Speech Clause of the First Amendment.

The principal issue on appeal is whether Mr. Thomas's report to the OSBI was made pursuant to his professional duties and therefore outside the scope of First Amendment protections under *Garcetti v. Ceballos*, 547 U.S. 410 (2006). Because we conclude that his speech was not made pursuant to his professional duties and was therefore constitutionally protected, we address the other issues relevant to when a public employee's discharge violates the First Amendment: whether the speech involved a matter of public concern, whether the government's interest outweighed the employee's free speech rights, whether the

speech was a motivating factor in the discharge, and (pertinent only to the mayor's appeal) whether the mayor personally participated in the decision to discharge Mr. Thomas. As to all these questions, our review is on appeal from a grant of summary judgement to the defendants; accordingly, the question is whether the evidence in the record, interpreted in the light most favorable to the plaintiff, would permit a reasonable jury to find a constitutional violation. We reverse summary judgment in favor of the defendants, except on the question of the mayor's personal responsibility.

## I. FACTUAL BACKGROUND

Before the discharge challenged in this case, Mr. Thomas was the building code inspector for the City of Blanchard, although he also had other duties. As building code inspector, Mr. Thomas would conduct a final inspection of new homes when construction was complete. If a home passed its final inspection, the builder would receive a certificate of occupancy ("certificate"). Certificates are signed both by the housing inspector and by the City Clerk, Camille Dowers. The builder had to go to City Hall to pick up the certificate of occupancy. Mr. Thomas, in his capacity as housing inspector, had no power to make policy, but was merely expected to "carry out the policies of the city."

According to the "typical practice," builders would call ahead to request an inspection and Mr. Thomas would conduct the inspection. When the inspection was finished, Mr. Thomas would phone City Hall to report the results; he would

also prepare a written report noting whether the house had passed inspection or not. It was common practice for Mr. Thomas and Ms. Dowers, the City Clerk, to "pre-sign" a number of blank certificates, so that when Mr. Thomas called with the news of a successful final inspection she could fill in the identifying information (owner, address) and make the certificate available immediately to the builder.

On Friday, April 14, 2005, Mr. Thomas noticed that there was a completed, signed certificate (including both his signature and Ms. Dowers') in the City Clerk's office for a house on 1118 Houser Lane, seeming to indicate that the house had been passed. The builder of this house was Tom Sacchieri, the Mayor of the City of Blanchard. Mr. Thomas had not yet performed a final inspection on the house, so the certificate, Mr. Thomas knew, had been filled in prematurely. Mr. Thomas told both Mr. Edwards and Ms. Dowers that the house on Houser Lane had not yet been "finalled out" and that the certificate was no good. Later Friday afternoon, Mr. Thomas called Ms. Dowers and asked that she tear up the certificate for the house on Houser Lane.

Mr. Thomas returned to city hall on the Monday following the weekend, wearing a recording device. He interrupted a meeting where the City Manager, Bill Edwards, and Mr. Thomas's supervisor, Monte Ketchum, were present, and told Mr. Edwards that the certificate for Mr. Sacchieri's house was false and that he wanted his name off of it. Mr. Thomas began asking Mr. Edwards whether he

"realize[d] it's against the law to be handing out" false certificates, but Mr. Edwards stopped him, saying he didn't need to be "lecture[d]" by Mr. Thomas. Mr. Thomas accused Mr. Edwards of giving the certificate to Mr. Sacchieri, to which Mr. Edwards responded: "[T]hat's a goddamn lie. . . . It is in my hands."

The remaining key parts of the dialogue, although to some extent obscured by inaudible words and passages, are as follows:

BILL EDWARDS: (inaudible)
IRA THOMAS: Okay. That's fine. If that's – if that's what you want to do. I'm going – I'm going to the OSBI [Oklahoma State Bureau of Investigation].
BILL EDWARDS: Okay.
IRA THOMAS: I'm – I'm going to the OSBI, and I'm going to – I'm going to – I'll talk to them about it.

...

IRA THOMAS: I'm not making demands. I'm just saying that I'll make – this is against the law, against the law.
BILL EDWARDS: I understand.
IRA THOMAS: And my name is on that document by false pretenses.
BILL EDWARDS: I tell you what –
IRA THOMAS: If you tear that document up right now, just tear it up in front of me, everything – everything will be good.
BILL EDWARDS: No, everything won't be good. But I'm gonna tear it up anyway.

Mr. Edwards then handed the document to Mr. Thomas, who ripped it up. Mr. Thomas apparently left City Hall, but re-entered through another door. He then entered Ms. Dowers' office and demanded that she hand over to him all of the blank pre-signed certificates. Ms. Dowers screamed. Later that day, at the

-5-

urging of Mr. Ketchum, Mr. Thomas returned to city hall and apologized to Mr. Edwards and Ms. Dowers for his "tone of voice."

Mr. Thomas conducted the final inspection of the 1118 Houser Lane house the same day. He concluded that there were several minor deficiencies that had to be corrected before he would approve the house for a certificate of occupancy. Mr. Sacchieri, who was present at the inspection, told Mr. Thomas that he had "got to be kidding" that the house did not pass. But he made the repairs, and Mr. Thomas approved the house the next day, April 18.

Earlier that day, Mr. Thomas had in fact contacted the OSBI, although Mr. Ketchum, Mr. Edwards, and Mr. Sacchieri had no knowledge of this. The OSBI told him that he needed to contact the sheriff's department first, which he did. He eventually contacted Lydia Williams of the OSBI, but did not actually meet with her until after he was fired. Mr. Thomas was terminated on April 21. Mr. Ketchum made the decision to fire Mr. Thomas, and notified Mr. Edwards before he did so. According to the record evidence, Mr. Sacchieri learned that Mr. Thomas had been fired approximately ten days later.

Mr. Thomas filed a 42 U.S.C. § 1983 complaint against the city, Mr. Edwards, Mr. Ketchum, and Mr. Sacchieri in Oklahoma District Court, alleging that he had been fired from his job for the exercise of his First Amendment rights. The complaint specifically alleged that in making his reports to the OSBI and the sheriff's office, Mr. Thomas was not "fulfilling any requirement of his job no[r]

acting pursuant to a directive imposed by his job description, assigned duties or a directive from a supervising official."

The defendants moved for summary judgment, arguing that the undisputed evidence showed that Mr. Thomas's speech had been uttered pursuant to his "official duties" and was therefore not protected by the First Amendment. They further argued that the undisputed evidence showed that Mr. Thomas's speech was not the cause of his termination, that the interests of the city *qua* employer outweighed Mr. Thomas's interest in his speech, and that Mr. Edwards and Mr. Ketchum were entitled to qualified immunity. Mr. Sacchieri filed a separate motion for summary judgment, arguing (in addition to the above) that he had not "personally participated" in the firing of Mr. Thomas and was therefore not liable. In his response, Mr. Thomas stated that he believed he would have been subject to criminal liability if he had "failed to protest and report the generation of a fraudulent certificate of occupancy."

The district court held that Mr. Thomas's speech — specifically, the report to the OSBI and his threat to make a report — was not protected by the First Amendment because it was made "pursuant to his official duties," and that, even if the speech was protected, his claim nevertheless failed "as a matter of law because [Mr. Thomas] cannot establish the requisite element of causation to support his retaliation claim." The city, Mr. Edwards, and Mr. Ketchum were granted summary judgment. Mr. Sacchieri was found not to have personally

participated in the firing, and so was also awarded summary judgment.  Mr.

Thomas appeals.

## II.  ANALYSIS

We review a district court's grant of summary judgment de novo, "applying

the same standard as the district court."  *Brammer-Hoelter v. Twin Peaks Charter*

*Academy*, 492 F.3d 1192, 1201 (10th Cir. 2007).  A grant of summary judgment is

proper only if the record shows there is "no genuine issue as to any material fact"

and the moving party is "entitled to judgment as a matter of law."  FED. R. CIV. P.

56(c).  In First Amendment cases, we have "an obligation to make an independent

examination of the whole record in order to make sure that the judgment does not

constitute a forbidden intrusion on the field of free expression."  *Bose Corp. v.*

*Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984); *see also*

*Brammer-Hoelter*, 492 F.3d at 1201–02.  The question of whether speech is

protected is a question of law, not of fact.  *Connick v. Myers*, 461 U.S. 138, 148

n.7 (1983).

### A.  Whether Mr. Thomas's Speech Was Constitutionally Protected

The United State Supreme Court's decision in *Garcetti v. Ceballos* set the

boundaries of what constitutes "protected" employee speech.  547 U.S. 410

(2006).  *Garcetti* recognized that the "First Amendment limits the ability of a

public employer to leverage the employment relationship to restrict, incidentally

or intentionally, the liberties employees enjoy in their capacities as private

-8-

citizens." *Id*. at 419. However, employee speech that is made "pursuant" to the employee's professional duties is not accorded First Amendment protection under *Garcetti*. *Id*. at 420, 421. This is because, the Court explained, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id* at 421–22.

*Garcetti* involved the Los Angeles County District Attorney's Office. A prosecutor, named Ceballos, prepared an internal office memorandum recommending dismissal of a case that was being pursued by the office. The memo and another like it led to a heated meeting; afterwards, Ceballos was reassigned from his position, transferred to another courthouse, and denied a promotion. *Id*. Ceballos sued, claiming the employment actions violated his constitutional rights. The Court found that Ceballos's statements, made directly to his supervisors and also in a memorandum, were made pursuant to his official duties and therefore not protected under the First Amendment. *Id*. at 422, 424. The Court explained that Ceballos was speaking in his role "as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed." *Id*. at 421. The speech was therefore "commissioned" by his employer. *Id*. 421–22. Ceballos was not so much a private citizen exercising free speech rights as an employee whose job consisted in part of speech, for which he could be evaluated,

rewarded, or disciplined. Because the "First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities," Ceballos' claim of unconstitutional retaliation failed. *Id*. at 424.

The question under *Garcetti* is not whether the speech was made during the employee's work hours, or whether it concerned the subject matter of his employment. *See id*. at 421. Merely because an employee's speech was made *at* work and *about* work does not necessarily remove that employee's speech from the ambit of constitutional protection. *See Brammer-Hoelter*, 492 F.3d at 1204. Rather, it is whether the speech was made pursuant to the employee's job duties or, in other words, whether the speech was "commissioned" by the employer. *Garcetti*, 547 U.S. at 421–22. In addressing that question, the Supreme Court deliberately refrained from defining a "comprehensive framework for defining the scope of an employee's duties." *Id.* at 424. It instead emphasized that the inquiry was "a practical one," and that a court cannot simply read off an employee's duties from a job description because "formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform." *Id*. at 424-25.

In this case, Mr. Thomas's supervisor, Monte Ketchum, conceded that Mr. Thomas's official duties did not include a "duty to contact the OSBI for perceived criminal violations." But that is not the end of the matter. The inquiry is a

practical one, and the defendants argue that Mr. Thomas's speech, including his decision to take the matter to the OSBI, "was about the type of work and responsibilities of his work at the City." Mr. Thomas was in charge of housing inspection; his signature was on certificates for houses he had approved for occupancy. He was aware that the certificate for the house on Houser Lane was fraudulent only because of his official duty as a housing inspector. Moreover, as stressed by the defendants, the alleged fact that a false certificate had been prepared would be relevant to Thomas's performance of his job. He would be expected to report such an occurrence at least to those higher up his chain of command.

This Court's precedents since *Garcetti* have taken a "broad" view of the meaning of speech that is "pursuant" to an employee's "official duties." Raj Chohan, Note, *Tenth Circuit Interpretations of* Garcetti*: Limits on First Amendment Protections for Whistle-Blowers*, 85 DENV. U. L. REV. 573, 584 (2008). In *Brammer-Hoelter*, we stated that "speech may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform." 492 F.3d 1192, 1203. Therefore the fact that it was not expressly Mr. Thomas's duty to report to the OSBI is not dispositive on whether he was acting "pursuant" to his duties. Indeed, in *Brammer-Hoelter*, we held that if speech "reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's

official duties." *Id*. at 1203 (citing *Williams v. Dallas Indep. Sch. Dist*., 480 F.3d 689, 693 (5th Cir. 2007) (per curiam). *See also Green v. Bd. of County Comm'rs*, 472 F.3d 794, 801 (10th Cir. 2007) (Green's activities not protected because they "stemmed from and were the type of activities that she was paid to do").

On the other hand, it would be going too far to hold that every time a public employee discovers alleged wrongdoing related to his job and brings it to the attention of law enforcement or other outside parties, the speech is unprotected. Mr. Thomas was not hired to detect fraud in connection with the issuance of certificates of occupancy; he was hired to inspect houses. Unlike Ceballos' recommendation not to pursue a case, which was part of his job and therefore subject to his employer's authority to evaluate and discipline, *Garcetti*, 547 U.S. at 421-22, Mr. Thomas's act went well beyond his official responsibilities. No one could say he was "commissioned" by the City to report suspected wrongdoing to the OSBI.

The line between "official" and "unofficial" duties is drawn most helpfully in *Casey v. West Las Vegas Independent School District*, 473 F.3d 1323 (10th Cir. 2007). Casey was the Chief Executive Officer of a Head Start program in Oklahoma. When she discovered that the Las Vegas School Board had been violating the Open Meetings Act, she warned the Board, and when the Board ignored her warnings, she complained in writing to the New Mexico Attorney General's office. We held that Casey was not acting within her job duties when

-12-

she went to the Attorney General's office to report the Board's alleged violation of the Act. *Id.* at 1332. We distinguished this from another incident, in which Casey reported certain complaints about the administration of the Head Start program, also ignored by the Board, to federal Head Start officials. The Head Start program, we said, was "committed to her care and . . . she had independent responsibilities to the federal government" to report fraud. *Id.*

We believe that Mr. Thomas's decision to report what he believed to be illegal activity relating to the falsely completed building certificate to the OSBI is akin to Casey's decision to take her grievance to the New Mexico Attorney General when "she . . . lost faith that the Board would listen to her advice" about the Open Meetings Act. *Id.* Mr. Thomas was not satisfied that Mr. Edwards or Mr. Ketchum would report the fraud to the authorities, so he "took his grievance elsewhere" — that is, to the OSBI. It was when Casey went beyond her supervisors and reported to someone outside her chain of command about a matter which was not committed to her care that we found that her speech was protected by the First Amendment. *Id.* So too, when Mr. Thomas went beyond complaining to his supervisors and instead threatened to report to the OSBI, an agency outside his chain of command, his speech ceased to be merely 'pursuant to his official duties' and became the speech of a concerned citizen.[1]

---

[1] Being outside one's "chain of command," we note, is not the same as being an outside authority or agency. In *Casey*, Ms. Casey's speech to federal

(continued...)

The fact that Mr. Thomas threatened to go outside his usual chain of command and report on suspected criminal activity to the OSBI, and not merely to his supervisors or to the state housing inspector, leads us to believe that he was not acting pursuant to his official duties. Threatening to report fraudulent certificates *to law enforcement officials* was not the "type" of activity Mr. Thomas was paid to do. *See Green*, 472 F.3d at 801; *cf. Hesse v. Jackson,* 541 F.3d 1240, 1250 (10th Cir. 2008) (holding that a plaintiff's conversations with an administrator were "pursuant to his official duties" because they "occurr[ed] for the purpose of addressing administrative issues and [were] directed to the contractually appropriate party"). Mr. Thomas was paid to inspect houses, and while informing Mr. Ketchum of a fraudulent certificate would reasonably have been pursuant to those duties, going outside his normal supervisors and inaugurating a criminal probe would seem not to be.

Following *Casey*, we must further consider whether Mr. Thomas had an underlying legal obligation, arising from his official position, to report the suspected wrongdoing. In *Casey*, the plaintiff would have been subject to civil and criminal liability by "remaining silent" in the face of her knowledge that

_____

[1](...continued)
authorities about the administration of the Head Start program was deemed to be a speech made to "outside authorities." *Casey*, 473 F.3d at 1132. But they nonetheless were within Ms. Casey's normal chain of command, and she was responsible for reporting fraud to them. *See Cheek v. City of Edwardsville*, No. 07-3341, 2008 WL 4150029, at *2–*3 (10th Cir. Sept. 10, 2008).

fraud in the administration of Head Start had occurred. *Casey*, 473 F.3d at 1330. We viewed this as relevant to determining whether reporting that fraud was pursuant to her official duties. *Id*. at 1330–31. According to his response to Mr. Sacchieri's motion for summary judgement, Mr. Thomas believed that if he did not report the fraud, he would be criminally liable. The district court relied on this ground in its grant of summary judgment for the defendants, stating that "[Mr. Thomas] believed he was obligated to report what he perceived, based on his knowledge and the conduct of his job, to be improper or unlawful activity."

Oklahoma law provides that "[a]ny clerk, register or other officer having the custody of any record" who permits that record to be "alter[ed] or falsifi[ed]" is subject to criminal liability. 21 Okl. St. § 461. Although Mr. Thomas never had custody of the allegedly fraudulent certificate, his silence upon having seen it might be construed as "permission" for the certificate to be issued. Had he let the certificate go through with his tacit approval, it is possible that he might have been subject to criminal liability. *See* 21 Okl. St. § 462.

But Mr. Thomas's liability can be distinguished from Ms. Casey's. Casey was liable under federal statute as the director of a federally funded program, and she was the person "primarily responsible" for the program being free of fraud. *Casey*, 473 F.3d at 1330. There was a close relationship between the authority who issued the regulations, the content of those regulations, and the scope of Casey's professional responsibilities.

-15-

Mr. Thomas was employed by the city, not by the state. And he was not given "primary responsibility" for ensuring that suspected fraudulent certificates were subject to criminal investigation or prosecution. More importantly, perhaps, it cannot be the case that a criminal liability statute aimed at *every* public official should somehow become part of every public official's job description. That would effectively make the obligation to report *and seek the prosecution of* fraud part of every employee's job. Mr. Thomas reported the certificate to Mr. Edwards, telling him it was not official. For this, he probably fulfilled his obligations under the state statute. To go beyond this, and to contact the law enforcement officials on his own, was beyond his professional responsibilities as a housing inspector. Moreover, having complained about the premature certificate to Mr. Edwards and having procured its destruction, Mr. Thomas was under no danger of legal liability for "permitting" the falsification of the certificate. Unlike Casey, who had to report to federal authorities to stop an ongoing fraud, which had not stopped when she complained to her immediate supervisors, Mr. Thomas's demand that the certificate be destroyed had already been satisfied.

Exercising de novo review of the legal question whether Mr. Thomas's speech was constitutionally protected, we therefore conclude that it was.

**B.** **Whether Mr. Thomas's Speech Was A Matter of Public Concern**

Having concluded that Mr. Thomas's speech was not made pursuant to his official duties, we must still consider whether Mr. Thomas's speech was on a matter of public concern, whether it was the cause of his termination, and whether the employer's interest in regulating the speech was greater than Mr. Thomas's interest in making it. We believe that these matters can be dealt with summarily. The former question we consider as a matter of law. The district court did not reach whether Mr. Thomas's speech was a matter of public concern, because it was found to be pursuant to his official duties. The City, Mr. Edwards, and Mr. Ketchum do not argue that Mr. Thomas's speech was not a matter of public concern, except indirectly: they say it was pursuant to his employment, and therefore could not be a matter of public concern.

Admitting that he raises this issue for the first time in this appeal, Mr. Sacchieri contends that Mr. Thomas's speech was not a matter of public concern because there was no criminal conduct by Mr. Sacchieri, only "personal grievances." But regardless of whether there was criminal conduct, the idea that the mayor — who was also a builder — might have pulled strings to secure approval of a house that had not yet passed its final inspection seems quintessentially a matter of public concern. Certainly if we found in *Casey* that a report of the School Board's violation of the Open Meetings Act was a matter of

public concern, then speech about possible illegality or pressure by the mayor would count as well.

## C. Did The City's Interest Outweigh Mr. Thomas's?

Mr. Edwards, Mr. Ketchum, and the City urge us to affirm on the ground that the city's interest as employer in promoting the efficiency of the services it performs outweighs the employee's interest in his speech.[2]  This is also a question of law.  *See Brammer-Hoelter*, 492 F.3d at 1203.  In our balancing of these two interests, we will give a greater weight to speech that has been deemed to be a matter of public concern.  *Descheneie v. Bd. of Educ. of Cent. Consol. Sch. Dist.*, 473 F.3d 1271, 1279 (10th Cir. 2007).  Mr. Edwards et al. point generally to Mr. Thomas's disruptive behavior, and suggest that this was the reason for his firing and justified it.

But if this is their argument, it confuses this prong of the *Garcetti/Pickering* test with the next prong: whether the plaintiff's speech was a motivating factor in his dismissal.  We deal with that argument below.  For purposes of the third prong, the question is not whether the plaintiff's speech was accompanied by disruptive behavior or made in a disruptive manner, but whether the government's legitimate interests provide a sufficient justification for

---

[2] Mr. Thomas argues that this argument and the following argument are not properly before the court.  *See* Thomas At. Br. 12, 16.  But Mr. Thomas lost his appeal, and we can affirm on any ground adequately supported by the record, "so long as the parties have had a fair opportunity to address that ground."  *Shero v. City of Grove*, 510 F.3d 1196, 1201 n.2 (10th Cir. 2007).

-18-

controlling the plaintiff's message. As we explained in *Cragg v. Osawatomie*, 143 F.3d 1343, 1346 (10th Cir. 1998), the *Pickering* analysis "requires us to ask whether [the employer] has an efficiency interest which would justify it *in restricting the particular speech at issue*." (emphasis added). The defendants make no argument relevant to that inquiry.

**D.      Was Mr. Thomas's Speech a Motivating Factor in his Dismissal?**

In order to establish his claim of retaliation, Mr. Thomas must also show that his speech was a "substantial" or "motivating" factor in the city's decision to terminate him. *Brammer-Hoelter*, 492 F.3d at 1203. This is a question of fact, not of law. *Id*. In their brief moving for summary judgment, Mr. Edwards, Mr. Ketchum and the City stated that part of the "disruptive" behavior that led to Mr. Thomas's termination was his "busting into two meetings that . . . Edwards was conducting, and engaging in insubordinate and disruptive behavior there, *including threatening to go to the OSBI*." (emphasis added). This seems to concede that Mr. Thomas's threat to go to the OSBI was at least one "motivating" factor in the city's decision to terminate him three days later; at the least, it creates a genuine issue of material fact on the question. We therefore conclude it was inappropriate to issue summary judgment on this basis. A reasonable jury might well conclude that Mr. Thomas was fired not because he went to the OSBI, but because of his aggressive manner in raising the issue of the premature certificate—breaking into meetings, making the City Clerk scream, generally

-19-

acting manic—but we cannot say on this record that a reasonable jury would be forced to that conclusion.

The district court stated that "[t]he evidence does not support *any* inference that, given these facts, defendants thought that plaintiff was going to report something to the OSBI or any other authority with regard to the final inspection of 1118 Houser Lane." (emphasis added). This disregards the defendants' own concession that Mr. Thomas's threat to go to the OSBI was part of the "disruptive conduct" that inspired his termination. For free speech purposes, it does not matter whether an employee is fired for actually reporting alleged wrongdoing to outside authorities or for threatening to do so.

### E. Are Mr. Edwards and Mr. Ketchum Entitled to Qualified Immunity?

Finally, Mr. Edwards and Mr. Ketchum argue that they are entitled to qualified immunity. We have already concluded that Mr. Thomas's speech was constitutionally protected and that it is a matter for a jury whether this speech was the cause of his termination. The remaining question under the qualified immunity analysis is whether Mr. Edwards and Mr. Ketchum violated "clearly established law" by terminating Mr. Thomas. Our statement in *Casey*, which involved similar circumstances, is sufficient to rebut this contention:

> Finding that Ms. Casey's right to be free from retaliatory employment action based on her protected First Amendment activities was potentially violated, we must still ask whether the right Ms. Casey asserts was clearly established in law such that it put

defendants on notice of the impropriety of their alleged retaliation. This we have little difficulty in doing. It has long been established law in this circuit that when a public employee speaks as a citizen on matters of public concern to outside entities despite the absence of any job-related reason to do so, the employer may not take retaliatory action.

*Casey*, 473 F.3d at 1333-34. Accordingly, we do not affirm judgment for Mr. Edwards and Mr. Ketchum on the basis of qualified immunity.

## F.    Did The Mayor Personally Participate in Mr. Thomas's Dismissal?

Mr. Sacchieri won summary judgment in district court on the ground that he had not "personally participated" in the firing of Mr. Thomas. Our review of the court's decision on Mr. Sacchieri is *de novo*. *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000). For Mr. Sacchieri to be personally liable for Mr. Thomas's termination, we must find a "causal connection" between Mr. Sacchieri's actions and a violation of Mr. Thomas's constitutional rights. *See Wulf v. Wichita*, 883 F.2d 842, 864 (10th Cir. 1989). Finding none, we affirm the district court's summary judgment as to Mr. Sacchieri.

Mr. Thomas admits that his case is "circumstantial," but he correctly maintains this is no barrier to proving causation. He cites:

The history of Mayor Sacchieri violating the building rules, Sacchieri's request for a certification on the house in question prior to final inspection, Edwards['] treatment of the Mayor as his boss, Edwards' statement to Thomas in connection with the critical incident that "we all have bosses", Sacchieri's conduct in attending the inspection and trying to get his house passed when it was not

compliant and the firing of Mr. Thomas on the day scheduled for closing of the house . . . .

Aplt. Br. 35-36

But none of these facts, even viewing them in the light most favorable to Mr. Thomas, ties Mr. Sacchieri to Mr. Thomas's termination. They show grounds for frustration on Mr. Sacchieri's part, and perhaps even pressure on Mr. Edwards to get the certificate. Nothing, however, links the decision to *fire* Mr. Thomas to Mr. Sacchieri – no statement is offered as evidence of Mr. Sacchieri's role, not even an indirect one. Even if we assume that Mr. Edward and Mr. Ketchum fired Mr. Thomas in order to curry favor with the Mayor, this is not sufficient to hold the latter responsible. *See, e.g., Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998) (plaintiff must allege specific facts "showing an agreement and concerted action" amongst defendants). Unless an official participates personally in a constitutional violation, as by instructions or improper training, he cannot be held responsible for the acts of his subordinates even if those acts were committed for his benefit. The record on summary judgment contains nothing to show that Mr. Sacchieri was a participant in the decision-making process that led up to Mr. Thomas's termination. As the district court concluded, Mr. Thomas "offered no evidence that Sacchieri requested plaintiff's termination or that he was involved in any way in the decision to terminate

-22-

plaintiff.  In fact, the evidence shows that he was not aware that plaintiff had been terminated until several days after the fact."

## CONCLUSION

Mr. Thomas's speech was constitutionally protected, and the question of whether he was fired for that speech is a matter of disputed fact.  Therefore we REVERSE the district court's grant of summary judgment as to Mr. Edwards, Mr. Ketchum, and the City and REMAND for further proceedings consistent with this opinion.  Because Mr. Sacchieri did not personally participate in the alleged violation of Mr. Thomas's constitutional rights, his motion for summary judgment was properly granted and we AFFIRM the district court's judgment as to Mr. Sacchieri.