ORDER AND JUDGMENT **
JEROME A. HOLMES, Circuit Judge.
Plaintiff-Appellant Louise M. Duvall appeals from the district court’s entry of summary judgment in favor of Defendants-Appellees Putnam City Independent School District No. 1 (the “District”), and Ms. Duvall’s former supervisors, Principal Lee Roland and Assistant Principal Marjorie Iven (collectively, “Defendants”). Ms. Duvall brought claims against Defendants asserting, inter alia, that Defendants’ adverse employment actions violated her rights under § 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the First Amendment. Defendants moved for summary judgment on all claims and the district court granted their motion.
Ms. Duvall asserts two issues on appeal. First, she contends that “Defendants retaliated against her in violation of § 504 of the Rehabilitation Act.” Aplt. Supp. Opening Br. at 21. Second, she claims that “Defendants retaliated against [her] for exercising her clearly-established First Amendment rights.” Id. at 27 (capitalization altered). For the reasons set forth below, we affirm.[1]
*807 I
Ms. Duvall worked as a special education teacher at Tulakes Elementary School (“Tulakes”) for many years. Ms. Duvall’s job duties included preparing Individual Education Plans (“IEPs”) for children with disabilities, conducting IEP meetings, ensuring compliance with state and federal laws, and documenting disagreements with IEPs. During the 2007-2008 school year, Ms. Iven was the assistant principal at Tulakes and was Ms. Du-vall’s direct supervisor. Mr. Roland, the principal of Tulakes since August 2004, supervised both Ms. Iven and Ms. Duvall.
Traditionally, the District pulled students with learning disabilities out of ordinary classrooms that included students without learning disabilities of like ages and placed them in separate special education classrooms. However, leading up to the 2007-2008 school year, the District began moving toward a “full inclusion” model for providing special education services. The full inclusion model sought to integrate special education students into regular classrooms, in part, by having special education teachers co-teach special education students in regular classrooms with age appropriate peers.
Prior to the 2007-2008 school year, Ms. Duvall had spent half a day in classrooms working with flex groups[2] and half a day providing pull-out services[3] in her own classroom. However, as part of Tulakes’s transition to the full inclusion model, Ms. Iven asked Ms. Duvall to work as a reading interventionist with multiple flex groups, which included both special and regular education students.
At this time, Ms. Duvall sought guidance from her superiors due to her concerns about ensuring compliance with federal laws and regulations regarding the provision of special education services to her students. Ms. Duvall was particularly concerned that removing pull-out services might violate the rights of her special education students. Ms. Duvall sent several e-mails to her superiors and also met with Glen Kastner, the Executive Director of Special Services for the District, on several occasions to discuss her concerns.
On October 3, 2007, Ms. Duvall wrote to Mr. Kastner requesting assurance that her compliance with the full inclusion model would not be breaking any state or federal guidelines. Mr. Kastner responded to Ms. Duvall’s request with a four-page letter dated October 11, 2007. In his letter, Mr. Kastner explained his views of the legality *808 of the District’s actions and assured Ms. Duvall that no federal laws or regulations were being violated. Mr. Kastner also assured Ms. Duvall that “[a]s long as [she] perform[ed her] duties in good faith within the scope of [her] assignment ... [she had] no reason to be concerned [about liability].” R. at 472 (Letter from Mr. Kastner to Ms. Duvall, dated Oct. 11, 2007). Mr. Kastner noted that “[i]f the District is found to be in non-compliance, the administration will be held responsible,” not Ms. Duvall. Id.
In addition to voicing her concerns to administrators, Ms. Duvall submitted letters of dissent relating to most of the IEPs with which she was involved during the 2007-2008 school year, and went to state agencies seeking information about “services for children.” Id. at 460 (Dep. of Louise Duvall, taken Jan. 12, 2011). During her deposition testimony, Ms. Duvall agreed that she did not specifically tell “Ms. Iven, Mr. Roland or other administrators at the district ... about [her] seeking information from those agencies,” but stated that she “certainly was very open about [her] concerns.”[4] Id.
On October 25, 2007, Ms. Iven wrote a Letter of Admonishment to Ms. Duvall. The letter stated as follows:
Thursday morning, October 11, 2007, an unfortunate incident occurred during an IEP. You presented the IEP in a manner that was disconcerting to the parents and team members. A letter of complaint was received the following day regarding the outcome of the proceedings.
The individual felt blind-sided and uninformed as to the content of the IEP, the lack of support offered, and the surprise at the need for the letter of dissension. The individual felt the meeting was misrepresentative and unprofessional
For all members of the IEP team, every effort needs to be made to deliver a positive, congruent plan. It is imperative that you are professional and a team player. Surreptitious behavior must cease.
Your failure to comply may result in a recommendation for termination or non-renewal of your contract.
Id. at 550 (Letter of Admonishment, dated Oct. 25, 2007). The District claims that this letter was written to Ms. Duvall “because of the manner in which she had conducted one specific IEP meeting and presented her Letter of Dissent,” and that the admonishment “was not given as a result of, or in retaliation for, [Ms. Duvall] presenting her Letters of Dissent generally, which she had been given permission to do.”[5] Id. at 402-03 (Def. District’s Mot. for Summ. J. & Br. in Supp., filed June 15, 2011); see also id. at 482-83 (Aff. of Marjorie Iven, dated June 15, 2011). Ms. Du-vall admitted during her deposition that the reason for the admonishment was that she “presented information at an IEP that *809 supposedly offended the classroom teacher that was there.” Id. at 452.
In early February 2008, Ms. Duvall requested from Ms. Iven a transfer form. At that time, Ms. Iven asked Ms. Duvall to wait until she could look at the schedule. Ms. Duvall did not hear back from Ms. Iven or Mr. Roland until April 28, 2008, when Mr. Roland “offered [Ms. Duvall her] choice between two regular education positions” for the following year. Id. at 1113 (E-mail from Louise Duvall to Glen Kast-ner, dated Apr. 29, 2008). “In the 2007-2008 school year, the last day a teacher could resign without having the possibility of her credentials held for up to one year was April 25, 2008.” Id. at 868 (Aff. of Louise Duvall, dated July 5, 2011). In response to Mr. Roland’s offer, Ms. Duvall informed him that she did not want to lose the extra five percent that she made as a special education teacher.[6] Ms. Duvall explained all of this in an e-mail to Mr. Kastner on April 29, 2008. In this e-mail she also stated: “This appears to be a good time to submit my transfer request.” Id. at 1113.
On May 21, 2008, Mr. Roland informed Ms. Duvall, via e-mail, that she was being assigned “to [f]irst grade for the 2008-2009 school year.” Id. at 1114 (E-mail from Lee Roland to Louise Duvall, dated May 21, 2008). According to Mr. Roland, “It was evident that [Ms.] Duvall did not agree with [the] District’s transition to a more inclusive model of serving special education students and that she was discontented in her current position as a special education teacher.” Id. at 475 (Aff. of Lee Roland, dated June 15, 2011). Further, Mr. Roland stated that he “believed that [Ms.] Duvall was unhappy in her current position as a special education teacher” and that “she would be happier and more comfortable in” first grade. Id.
On April 16, 2009, Ms. Duvall filed a formal grievance stating that she felt “as though [she] ha[d] been treated differently from other faculty members.” Id. at 1045 (Formal Grievance Presentation, dated Apr. 16, 2009). On April 22, 2009, Ms. Duvall submitted her resignation to Dr. April Grace, the executive director of human resources.
Ms. Duvall commenced this lawsuit, in Oklahoma state court, shortly after submitting her resignation in April 2009. Defendants removed the case to federal court in December 2009. On June 15, 2011, Defendants filed motions for summary judgment on all of Ms. Duvall’s claims. The district court granted these motions as to all claims and all defendants in a single twenty-nine page order. Ms. Duvall now appeals the district court’s grant of summary judgment in favor of Defendants on her retaliation claims under the Rehabilitation Act and the First Amendment.
II
“We review a district court’s grant of summary judgment de novo, applying the same standard as the district court.” Helm v. Kansas, 656 F.3d 1277, 1284 (10th Cir.2011). More specifically, summary judgment is appropriate “if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(a). “We view the summary judgment evidence in the light most favorable to the non-movant, applying the same standard as the district court.” Bertsch v. Overstock.com, 684 F.3d 1023, 1027 (10th Cir.2012).
*810 “With respect to [Ms. Duvall’s] § 504 claim [under the Rehabilitation Act], we review the establishment of a prima facie case of retaliation de novo.” Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d 1126, 1131 (10th Cir.2010). With regard to Ms. Duvall’s First Amendment claim, “we have an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression.” Id. (quoting Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22, 473 F.3d 1271, 1276 (10th Cir.2007)) (internal quotation marks omitted).
A
We turn first to Ms. Duvall’s claim that the district court erred in granting summary judgment in favor of Defendants on Ms. Duvall’s claim under § 504 of the Rehabilitation Act.
“In the absence of direct evidence [of retaliation], [Ms. Duvall] may rely upon the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).” Reinhardt, 595 F.3d at 1131. Under this framework, Ms. Duvall establishes a prima facie claim of retaliation under the Rehabilitation Act by showing: “(1) that she engaged in protected activity; (2) that she suffered a materially adverse action by [Defendants] either after or contemporaneous with her protected activity; and (3) a causal connection between the protected activity and the adverse action.” Id. If Ms. Duvall establishes such a case, the burden shifts to Defendants to “produce evidence of a legitimate, nonretaliato-ry reason for the adverse action.” Id. If Defendants do so, “the burden of production shifts back to [Ms. Duvall] to show that the proffered reason is pretextual.” Id.
In its filings before the district court, the District “eoneede[d] for purposes of its motion for summary judgment that [Ms. Duvall] engaged in protected activity,” see R. at 1475 (Order, dated Aug. 24, 2011), and Defendants do not argue otherwise on appeal. Thus, we conclude that the first prong of McDonnell Douglas is met. We turn then to the second and third prongs of the test — whether Ms. Duvall suffered a materially adverse action by Defendants and whether there was a casual connection between the adverse action and Ms. Du-vall’s protected activity.
To establish an adverse action, Ms. Du-vall must show that “a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.” Reinhardt, 595 F.3d at 1133 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)) (internal quotation marks omitted). Here, Ms. Duvall points to two actions that she argues were materially adverse: (1) the letter of admonishment she received from Ms. Iven on October 25, 2007; and (2) her reassignment to first grade by Mr. Roland. We address each of these actions in turn.
With regard to Ms. Iven’s letter of admonishment, the district court concluded that “the letter of admonishment ... [did] not constitute adverse action ... [because Ms. Duvall] admitted that she was admonished because of the inappropriate manner in which she presented a letter of dissent[,] [and] [t]he admonishment did not affect her employment or alter her workplace conditions.” R. at 1475 n. 26. Generally speaking, we agree with the district court. We conclude that the letter of admonishment did not constitute an adverse action because the letter did not affect Ms. Duvall’s work conditions or materially af- *811 feet her employment. See EEOC v. C.R. England, Inc., 644 F.3d 1028, 1040 (10th Cir.2011) (noting that even though the term “adverse employment action is not necessarily limited” to acts “such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits[,] ... a plaintiff must [always] show that the alleged adverse action caused more than de minimis harm to or a de minimis impact upon an employee’s job opportunities or status” (citations omitted) (internal quotation marks omitted)); Reinhardt, 595 F.3d at 1133 (“Acts that carry a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects may be considered adverse actions, although a mere inconvenience or an alteration of job responsibilities will not suffice.” (quoting Annett v. Univ. of Kan., 371 F.3d 1233, 1239 (10th Cir.2004)) (internal quotation marks omitted)). Moreover, it is clear that the letter of admonishment was triggered by the manner in which Ms. Duvall conducted her advocacy as opposed to the content of her advocacy activity.
Accordingly, we conclude that sending Ms. Duvall the letter of admonishment did not constitute an adverse action. Because Ms. Duvall has not identified any other allegedly adverse actions that are attributable to Ms. Iven, we conclude that Ms. Duvall has failed to make out a prima facie claim of retaliation under the Rehabilitation Act as to Ms. Iven. The district court therefore properly granted summary judgment in favor of Ms. Iven on Ms. Duvall’s claim of retaliation under the Rehabilitation Act.
With regard to Ms. Duvall’s reassignment to first grade, the district court concluded that “the reassignment of [Ms. Duvall] to a lower paid position [was] sufficient to make the necessary showing of adverse action.” R. at 1475. Again, we agree with the district court. Specifically, we conclude that Mr. Roland’s transfer of Ms. Duvall to a lower paid position constituted an adverse action because it resulted in a monetary loss — a five percent decrease in Ms. Duvall’s salary.
We turn then to the third prong of McDonnell Douglas — whether Ms. Duvall has “established] a causal connection” between her advocacy on behalf of her special education students and her reassignment to first grade. Reinhardt, 595 F.3d at 1134. “Causal connection may be established by producing ‘evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.’” Id. (quoting Haynes v. Level 3 Commc’ns, LLC, 456 F.3d 1215, 1228 (10th Cir.2006), abrogated in part by Burlington N., 548 U.S. at 68, 126 S.Ct. 2405, on other grounds as recognized in Bertsch, 684 F.3d at 1029).
Most of Ms. Duvall’s communications with her superiors concerning Tulakes’s special education program took place in October and November 2007. Ms. Du-vall’s reassignment occurred approximately six months later in April 2008. However, as noted by the district court, Ms. Duvall “continued throughout the 2007-08 school year to voice her concerns about the District’s change in method of providing special education services through her letters of dissent to various IEP’s.” R. at 1476. Accordingly, we conclude that Ms. Duvall’s reassignment was “relatively close in time to at least some of [her] dissenting letters or similar objections.” Id. Ms. Du-vall has therefore established a sufficient causal connection between her protected activity and her reassignment to make out a prima facie case of retaliation under the Rehabilitation Act as to Mr. Roland and the District.
*812 Because Ms. Duvall has established a prima facie claim of retaliation under the Rehabilitation Act as to Mr. Roland and the District, the burden shifts to Mr. Roland and the District to “produce evidence of a legitimate, nonretaliatory reason for [Ms. Duvall’s reassignment].” Reinhardt, 595 F.3d at 1131. Here, the District and Mr. Roland produced evidence that Mr. Roland reassigned Ms. Duvall for a legitimate reason — “because [he] believed she would be happier and more comfortable in [a first grade] position and that such a move would greatly benefit her, her students, and the school.” R. at 475. We agree with the district court that this justification for reassigning Ms. Duvall was sufficient to meet the “exceedingly light burden under McDonnell Douglas and shift the burden back to [Ms. Duvall] to show that [Mr. Roland’s and the District’s] proffered justification was merely a pretext.” Zamora v. Elite Logistics, Inc., 478 F.3d 1160, 1165-66 (10th Cir.2007) (en banc) (citation omitted) (internal quotation marks omitted); see also Reinhardt, 595 F.3d at 1131.
“To establish a genuine issue of material fact as to pretext, [Ms. Duvall] must demonstrate that [Mr. Roland’s and the District’s] ‘proffered non-discriminatory reason is unworthy of belief.’ ” Reinhardt, 595 F.3d at 1134 (quoting Pinkerton v. Colo. Dep’t of Transp., 563 F.3d 1052, 1065 (10th Cir.2009)). Ms. Duvall “can meet this standard by producing evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer’s proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.” Id. (quoting Pinkerton, 563 F.3d at 1065) (internal quotation marks omitted). “[T]he pertinent question in determining pretext is not whether the employer was right ... but whether [the employer’s] belief was genuine or pretex-tual.” Pastran v. K-Mart Corp., 210 F.3d 1201, 1206 (10th Cir.2000) (first alteration in original) (quoting Hardy v. S.F. Phosphates, L.C., 185 F.3d 1076, 1080 (10th Cir.1999)) (internal quotation marks omitted); see Stover v. Martinez, 382 F.3d 1064, 1076 (10th Cir.2004) (“We are mindful that in evaluating pretext, the ‘relevant inquiry is not whether [the employer’s] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs.’ ” (quoting Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1318 (10th Cir.1999), abrogated on other grounds as recognized in Boyer v. Cordant Tech., Inc., 316 F.3d 1137, 1140 (10th Cir.2003))).
The district court found that Ms. Duvall had not “produced evidence showing that the District’s proffered reasons for its decision to reassign her were pretextual.” R. at 1476. On the other hand, Ms. Duvall argues that the explanation “that Mr. Roland believed she would be ‘happier’ in first grade ... is implausible and unworthy of belief.” Aplt. Supp. Opening Br. at 24. However, Ms. Duvall’s argument is undercut by her own evidence and testimony. Ms. Duvall made it clear that she was unhappy with her assignment in the 2007-2008 school year, and she even testified that “[Mr. Roland] probably in his mind was correct [in believing that she was not happy with her assignment during the 2007-2008 school year].” R. at 465-66. It is therefore not unreasonable for Mr. Roland to think that she would have been “happier” in a different position, particularly in light of the fact that Defendants intended to proceed with the transition to the full inclusion model — a model to which Ms. Duvall was openly opposed.
*813 Moreover, Ms. Duvall’s “happiness” was not the only reason given by Mr. Roland for her transfer. Rather, Mr. Roland also stated that he believed transferring Ms. Duvall “would greatly benefit ... her students[ ] and the school.” Id. at 475. The school was committed to transitioning to a full inclusion special education model, and given Ms. Duvall’s lack of support and resistance to this model, it was reasonable for Mr. Roland to believe that the school and students would be better served by transferring Ms. Duvall to a teaching position outside of the special education program. Accordingly, the school had multiple legitimate reasons for transferring Ms. Duvall — only one of which was Ms. Du-vall’s happiness — and there is no evidence to support Ms. Duvall’s contention that Mr. Roland did not genuinely believe the school and students would be better served by transferring Ms. Duvall to a first grade position.
Based on the foregoing, Ms. Duvall has not established that Mr. Roland’s and the District’s explanation for her transfer was unworthy of belief or “pretextual.” As such, the district court correctly granted summary judgment to Mr. Roland and the District on Ms. Duvall’s claim of retaliation under § 504 of the Rehabilitation Act.
B
We turn next to Ms. Duvall’s claim that Defendants retaliated against her in violation of the First Amendment. “The [Supreme] Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment.” Garcetti v. Ceballos, 547 U.S. 410, 417, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). They retain a constitutional “right, in certain circumstances, to speak as a citizen addressing matters of public concern.”- Id. “In determining whether [Defendants] impermissibly retaliated against [Ms. Duvall] in violation of her First Amendment rights, we apply the test from Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and Connick v. Myers, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).” Reinhardt, 595 F.3d at 1135. This test, called the “Garcetti/Pickering analysis,” has five prongs:
(1) whether the speech was made pursuant to an employee’s official duties; (2) whether the speech was on a matter of public concern; (3) whether the government’s interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiffs free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.
Dixon v. Kirkpatrick, 553 F.3d 1294, 1302 (10th Cir.2009). Typically, “[t]he first three ‘prongs’ are said to be issues of law to be decided by the court; the last two are factual issues to be decided by the fact finder.” Id.
We begin by addressing the first prong of the Garcetti/Pickering test — i.e., whether Ms. Duvall’s speech was made pursuant to her official employment duties. Ms. Duvall argues that she was speaking as a member of the general public, as opposed to pursuant to her official duties, when she communicated her concerns about the District’s decision to transition towards a full inclusion model to her supervisors and the State Department of Education Personnel. See Aplt. Supp. Opening Br. at 30. Additionally, with respect to her communications to parents, she asserts that “[n]othing under state or federal law ... required her to notify the parents that she believed the policy adopted by the *814 School District and its specific application to certain students violated federal law by ignoring the student’s individual needs.” Id. at 33.
In contrast, Defendants argue that Ms. Duvall’s “speech to her supervisors complaining about the services provided to special education students is clearly speech taken pursuant to her official duties.” Aplee. Supp. Br. at 33. Additionally, they contend that her “preparation and attachment of Letters of Dissent was absolutely a part of her official duties as a special education teacher participating on the IEP team and completing IEP’s and was likewise not protected speech” because “her obligation to dissent arose from and existed solely because of her employment as a teacher and the duties associated with such employment.” Id. at 34. Finally, they assert that Ms. Duvall “submitted no evidence that anyone from [the] District, including [Mr.] Roland or [Ms.] Iven, [was] aware that she had conveyed her views about the impropriety of the inclusion model to anyone other than District personnel.” Id. at 35.
“[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.” Garcetti, 547 U.S. at 421, 126 S.Ct. 1951. We have previously “taken a broad view of the meaning of speech that is pursuant to an employee’s official duties.” Thomas v. City of Blanchard, 548 F.3d 1317, 1324 (10th Cir.2008) (citation omitted) (internal quotation marks omitted). It can include speech that “deals with activities that the employee is not expressly required to perform.” Id. (quoting Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1203 (10th Cir.2007)) (internal quotation marks omitted). “The guiding principle is that speech is made pursuant to official duties if it involves ‘the type of activities that [the employee] was paid to do.’ ” Chavez-Rodriguez v. City of Santa Fe, 596 F.3d 708, 713 (10th Cir.2010) (alteration in original) (quoting Green v. Bd. of Cnty. Comm’rs, 472 F.3d 794, 801 (10th Cir.2007)).
Based on the foregoing principles, we agree with the district court’s conclusion that Ms. Duvall’s speech to her supervisors and other individuals within the District was undertaken in the course of her official duties. Ms. Duvall does not dispute that part of her responsibility as a special education teacher was to ensure compliance with state and federal law. Moreover, when asked during her deposition whether she believed it was part of her job “to point out to the administration [her] concerns about potential legal violations by implementing ... or changing the IEPs as [she was] directed,” Ms. Duvall responded: “[Y]es, I do believe it is a job of a special ed teacher.” R. at 462-63. Similarly, Ms. Duvall’s communications to parents regarding her concerns about the special education model were also within the scope of her job responsibilities, as it is undisputed that Ms. Duvall’s job obligations included writing letters of dissent. Accordingly, Ms. Duvall has failed to satisfy the first prong of the Garcetti/Pickering test with regard to any communications she made to her supervisors or to parents of children in the District.
However, we conclude that Ms. Duvall has arguably satisfied the first prong of the Garcetti/Pickering test with regard to her communications to the State Board of Education, as these communications were to individuals outside her chain of command and went beyond the scope of her official job duties. That being said, we agree with the district court’s conclusion that “[e]ven if [Ms. Duvall’s] First Amend *815 ment claim survived the first three steps of the Garcetti/Pickering analysis, it would nonetheless fail at the fourth step because of lack of evidence of causation.”[7] Id. at 1482.
“Under the fourth-prong of [the Garcetti/Pickering test], [Ms. Duvall] bear[s] the burden of establishing both a detrimental employment decision (adverse employment action) [i.e., allegedly, the transfer] and causation — that is, that the constitutionally protected speech was a substantial motivating factor in [Defendants’] decision to [transfer her].”[8] Couch v. Bd. of Trs. of Mem’l Hosp., 587 F.3d 1223, 1236 (10th Cir.2009) (quoting Maestas v. Segura, 416 F.3d 1182, 1188 & n. 5 (10th Cir.2005)) (internal quotation marks omitted). “An employer’s knowledge of the protected speech, together with close temporal proximity between the speech and challenged action, may be sufficiently probative of causation to withstand summary judgment.” Maestas, 416 F.3d at 1189; see also Rohrbough, 596 F.3d at 750 (concluding that the plaintiff failed to meet the fourth prong where she had presented “no evidence whatsoever that [she] told [her supervisor] ... of her [speech]”). “Other evidence of causation may include evidence the employer expressed opposition to the employee’s speech, or evidence the speech implicated the employer in serious misconduct or wrongdoing.” Maestas, 416 F.3d at 1189 (citation omitted).
Here, Ms. Duvall has failed to produce any evidence establishing that Defendants were aware of her alleged communication of her views regarding the District’s full inclusion model to the State Department of Education. Although Defendants knew Ms. Duvall had “consulted with [the] State Department of Education Personnel,” R. at 882, there is no evidence concerning the content of these communications. Thus, while the record establishes that Ms. Du-vall “consulted” with the State Department of Education, it does not establish that she communicated her views on the full inclusion model to the Department. And, even if Ms. Duvall did communicate her views on the full inclusion model to the State Department of Education, there is absolutely no evidence establishing that Defendants knew of the content of these communications. Therefore, it ineluctably follows that Ms. Duvall’s statements to the State Department of Education could not have *816 been a motivating factor in any adverse employment action, as Defendants were unaware of the content of any such communications. Accordingly, Ms. Duvall has failed to establish causation under the Garcetti/Pickering test, and the district court properly granted summary judgment to Defendants on Ms. Duvall’s First Amendment claim of retaliation.[9]
Ill
For the foregoing reasons, we affirm the judgment of the district court.

 This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

. Before the district court, and initially before this court, Ms. Duvall proceeded pro se. Subsequently, we appointed counsel to represent her on appeal and allowed counsel to file a supplemental brief. We pause to thank counsel for his able representation of Ms. Duvall, which aided the court in resolving this appeal.
In light of her initial pro se status, the district court compiled a record and transmitted it to us pursuant to Tenth Circuit Rule 11.2(A). As authorized by the appointment order, Ms. Duvall’s counsel moved our court to supplement the record. The Defendants only opposed a portion of this motion. That portion related to certain trial exhibits that Ms. Duvall allegedly sought to file with the district court but was unsuccessful — reportedly, for logistical or technical reasons — in doing so; the unopposed portion of the motion related to documents that were properly filed in the district court. Under its authority pursuant to Tenth Circuit Rule 27.3(A)(3), the clerk granted the unopposed portion of Ms. Duvall’s motion and left the remainder for resolution by the merits panel. We decline to grant the balance of the motion that relates to documents that were not properly filed in the district court. See, e.g., United States v. Balderama-Iribe, 490 F.3d 1199, 1202 n. 4 (10th Cir.2007) (“Because the letter was not submitted to the district court, ... the appellate rules ordinarily do not permit us to include it now in the record on appeal.”). In other words, we deny the remainder of the motion. Although Ms. Duvall was proceeding pro se before the district court, if she deemed those documents to be relevant to her case, it was her obligation to ensure that they were properly filed. See, e.g., Abdulhaseeb v. Calbone, 600 F.3d 1301, 1310 (10th Cir.2010) (noting that “while pro se litigants are entitled to a liberal reading of their filings, they still must follow the established procedures” (citation omitted)); see also United States v. Ceballos-Martinez, 387 F.3d 1140, 1145 (10th Cir.2004) (noting that "even pro se litigants” do not have "carte blanche to disregard congression *807 ally established procedural rules”). Indeed, she managed to accomplish this task as it relates to her other papers before the district court. Furthermore, Ms. Duvall has not made a cogent argument for why these supplemental documents are necessary to our resolution of this appeal. For example, she focuses almost exclusively in her motion on the presence in these documents of a few pages of "exemplars of [her] dissents” to the Individual Education Plans. Aplt.’s Mot. to Supplement at 7 (filed July 2, 2012). However, as noted infra, Defendants have not disputed that Ms. Duvall engaged in protected activity — which presumably the contents of her dissents would validate — and Ms. Duvall fails to explain what additional light these documents would shed on the matters contested here. In short, "we conclude the circumstances in the present case do not lead us to believe the interests of justice would best be served by exercising our inherent equitable power to allow [Ms. Duvall] to [further] supplement the record on appeal.” United States v. Kennedy, 225 F.3d 1187, 1193 (10th Cir.2000).

. A flex group is a small group of children needing help with a particular skill.

. Pull-out services are provided by special education teachers to special education students by removing them from their regular education classrooms and bringing them to special education classrooms for one-on-one or small group instruction.

. There is at least one letter in the record that indicates Ms. Duvall did notify Ms. Iven that she had "consulted with State Department of Education Personnel” regarding letters of dissent, R. at 1108 (Letter from Louise Duvall to Marjorie Iven, dated Nov. 2, 2007); however, as discussed infra, there is no evidence concerning the content of Ms. Duvall’s communications with the State Department of Education Personnel and no evidence to support the contention that Defendants were aware of the content of Ms. Duvall’s communications.

. Mr. Roland and Ms. Iven both submitted affidavits stating that they gave Ms. Duvall permission to submit letters of dissent if she felt they were appropriate. Ms. Duvall also testified at her deposition that Ms. Iven indicated to her that she could continue to submit letters of dissent to the IEPs.

. During material times, special education teachers’ salaries were five percent higher than the salaries of regular education teachers.

. The district court did not address the second and third prongs of the Garcetti/Pickering test in its ruling, and the parties do not address either of these prongs on appeal. Because the parties have thus waived any arguments relating to the second and third prongs — and because we find the first and fourth prongs to be determinative — we limit our analysis to the first and fourth prongs of the Garcetti/Pickering test. See United States v. Cooper, 654 F.3d 1104, 1128 (10th Cir.2011) ("It is well-settled that '[arguments inadequately briefed in the opening brief are waived.' ” (alteration in original) (quoting Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 679 (10th Cir.1998))); Bronson v. Swensen, 500 F.3d 1099, 1104 (10th Cir.2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant’s opening brief.”).

. Ms. Duvall argues that "the question of causation is ordinarily one for a jury to decidef,] [and] the District Court preemptively ruled" on it. Aplt. Supp. Opening Br. at 36. However, as the district court correctly noted, "[ajlthough the jury ordinarily resolves step four, the court can consider it when there is no evidence in the record from which a trier of fact could reasonably conclude that the employee's speech was a motivating factor in the detrimental employment decision.” R. at 1482 n. 30; see also Rohrbough v. Univ. of Colo. Hosp. Auth., 596 F.3d 741, 750 (10th Cir.2010) ("Although [the fourth] step is ordinarily resolved by the trier of fact, there simply is no evidence in the record from which a trier of fact could reasonably conclude the ... speech was a motivating factor in [plaintiff’s] termination." (citation omitted)).

. Because we conclude that the district court’s grant of summary judgment in favor of Defendants was proper, we need not reach Defendants’ alternative argument that Ms. Iven and Mr. Roland were entitled to qualified immunity.